[Civ. No. 20788. Fourth Dist., Div. Two. Nov. 26, 1979.]

LA RINDA KAY BLAKE, Plaintiff and Appellant, v.
AETNA LIFE INSURANCE COMPANY,
Defendant and Appellant.

904

COUNSEL

Pistone, Schatz & Slavett and Jeffrey Lieber for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, John J. Swenson, Jeff R. Hudson, Kight & Sutton and John L. Fort for Defendant and Appellant.

OPINION

McDANIEL, J.—Thomas Jeffery Blake (Blake) was insured under a group policy of life insurance written for his employer by defendant Aetna Life Insurance Company (Aetna), which policy provided for basic coverage of $10,000 plus an equal amount payable for accidental death. Blake died, and the amended death certificate indicated that the occasion of death was "undetermined" as distinguished from possible specification thereon of *accident, suicide*, or *homicide* as such occasion.

Upon notification of Blake's death, Aetna promptly paid the $10,000 due under the basic coverage. However, the double indemnity was not paid, Aetna taking the position at all times up to judgment that Blake's death had not been shown to have been accidental.

Blake's widow (plaintiff) commenced suit against Aetna a year and four months after his death seeking a declaratory judgment that the ac-

cidental death benefit was also payable. Five months later, after a successful motion for leave to do so, plaintiff filed her first amended complaint, alleging two causes of action. The first count sought recovery of the accidental death benefit; the second sought damages for emotional distress proximately caused by Aetna's alleged "bad faith" in failing to settle the claim[1] plus attorney's fees and exemplary damages.

The case was tried to a jury which brought in a differentiated verdict of $10,000 on the first count and $10,000 on the second count, the court having refused to instruct on exemplary damages. Plaintiff appealed on the exemplary damage issue, and Aetna cross-appealed from the judgment on the "bad faith" count. We reverse, with directions, the judgment on the bad faith count and otherwise affirm.

## THE POLICY PROVISIONS

As here pertinent, the policy provided: "ADDITIONAL ACCIDENTAL DEATH BENEFIT

"In addition to the amount of life insurance, an equal amount will be payable to the beneficiary in accordance with the terms of the group policy *upon receipt of due proof*

"(a) that the death of the Employee was *a direct result of an injury caused by an accident*, and . . . provided, however, that the Additional Accidental Death Benefit will not be payable if death resulted from an injury caused or contributed to by or as a consequence of, any of the following excluded risks, even though the proximate or preciptating [sic] cause of loss is accidental bodily injury: . . . [¶] (d) suicide or any attempt thereat (whether sane or insane) [.]" (Italics added.)

## THE OPERATIVE FACTS

Because of the two counts alleged by plaintiff, she was faced at the trial with two general areas of proof. The first was to prove that the death was accidental under the terms of the policy; the second was to prove that Aetna had acted *unreasonably* in denying the claim for the

---

[1]The key allegation of the second count was that Aetna had "breached its obligation to plaintiff and did not act in good faith by unreasonably delaying benefits, not conducting a reasonable investigation as to the cause of death of plaintiff's husband and denying any payment to plaintiff when liability was reasonably clear."

additional benefit for accidental death. As a part of the latter effort, plaintiff was also faced with the proof of malice, oppression, or fraud as a predicate for any entitlement to exemplary damages.

Turning to the evidentiary record, the *amended* death certificate recited that the immediate cause of death was "barbituric acid poisoning." On part II of that certificate, entitled "other significant conditions," space 33 called for an entry of "accident, suicide or homicide." The entry there reads "undetermined." On the initial death certificate, the entry under "immediate cause" reads "pending investigation." The original certificate is dated August 19, 1974, and shows the date of death as August 11, 1974. There is no inscribed entry in space 33 on the original. The amended death certificate is dated September 4, 1974, and was filed after an extensive investigation by the coroner's division of the sheriff's office. From these two items of documentary evidence it appears that the coroner was unable to determine either the immediate cause of death or whether it was accidental or a suicide at the time Blake's body was first discovered; they also show, even after an investigation over a period of more than two weeks, which included an autopsy and a toxicology report, that the coroner was unable to specify whether the death was an accident or a suicide.

The plaintiff and Blake lived in a real estate development in the El Toro area of Orange County known as Lake Forest. This area includes a small man-made lake. Blake's body was first seen the morning of his death by Gene Esparza, an employee of a construction company which was building houses near the lake noted. According to the report of the coroner's investigation, Esparza stated that he "saw the deceased slumped over the starboard side of [an] inflatable raft.[2] The upper one-third of his body and his arms were in the water. He was face down and his abdomen was over the gunnel." By the time the coroner arrived at the scene, Blake's body had been pulled ashore and rolled over. He was fully clothed, and a search of his person failed to disclose any identification; however, automobile keys were found which eventually were fitted to a Ford Pinto stationwagon parked near another part of the lake.

Blake had been employed as a sales representative for Riker Laboratories, a division of Minnesota Mining and Manufacturing Company,

---

[2]This raft had been described earlier in the coroner's report as "a small inflatable orange colored raft, commonly identified as a one man raft, approximately 6 feet in length..."

headquartered in St. Paul, Minnesota. Blake had been hired by Riker after an interview with and the processing of his application by Richard Barrette. Barrette was Blake's supervisor and good friend, and learned of the death soon after it happened. When Barrette notified his superiors of the death, he was instructed to go down to Blake's home and retrieve all of the stock of pharmaceuticals which he had had in his possession as a Riker salesman. Barrette was also instructed to pick up the company car and other items belonging to Riker.

Barrette arrived on Monday morning after the Saturday death to carry out this task after first arranging with the plaintiff by telephone to do so. When he arrived, he found her in a highly distressed state. Barrette also encountered Vernon Grim, the plaintiff's father, who exhibited a very hostile attitude toward Barrette and his mission. In the course of going through the Pinto stationwagon to find the various items belonging to Riker, Barrette found a pill bottle on the front seat. The label on the bottle showed that a prescription for the contents had been filled by a pharmacy in Long Beach. Barrette counted the contents of the bottle which turned out to be 90 tablets of Tuinal, a highly dangerous barbiturate, and found two more on a so-called coffee caddy in the front passenger compartment of the Pinto. The prescription was for 100 tablets and had been filled three days before Blake's death for his sister Pat Lyman, a resident of New York who was never in California during 1974. Barrette in his testimony could not recall whether the prescribing doctor's name was on the label or whether he found it out later when he went to the pharmacy. In any case, Exhibit "G" in evidence shows that the prescription was written by Eric R. Hubbard a podiatrist practicing in Long Beach. Other testimony revealed that Hubbard was a friend of Blake with whom he socialized frequently.

According to Barrette's testimony he turned the bottle of pills over to Grim. He testified that he knew he had a "hot potato" in his hand, and said to Grim, "My company certainly [doesn't] want any part of it." He then handed the bottle of pills to Grim and said, "You do what you want with it."

Otherwise, it appears from Barrette's testimony that he was "incensed" by the discovery of the Tuinal, so much so that he went to the pharmacy in Long Beach to inquire into the matter. Upon being asked what he was incensed about, Barrette answered, "[b]ecause that [Tuinal] is a dangerous drug and it is caution [*sic*] to be written in any

kind of quantity and only written after physical examination and to have prescribed 100 tablets or capsules for someone 3600 miles away is ridiculous."

What follows in this portion of the opinion did not for the most part come to the knowledge and attention of Aetna until discovery and trial and therefore did not figure in its continuing evaluation of the claim before suit was filed. However, it is of significance here in terms of the representations made by plaintiff's attorney to Aetna before the complaint was filed. It is also significant in terms of what plaintiff and her attorney did *not* disclose to Aetna with reference to the merits of the double indemnity claim.

As already noted, Blake was employed by Riker Laboratories beginning in 1969. This was shortly after his marriage to plaintiff. Plaintiff testified that Blake had expressed himself to her just before his death as being unhappy with his job and feeling stagnant because he had been doing the same thing for five years.

In addition to his familiarity with drugs as a salesman, Blake had had experience with the personal use of drugs, a practice he admitted to Barrette. He started this practice following a divorce from his first wife after which he moved into a commune type house where the use of a variety of hard drugs was the primary activity. After his marriage to plaintiff Blake continued to use drugs for pleasure, and such use often involved the drug Tuinal. At times Blake obtained Tuinal by exchanging his drug samples for it. On two occasions before his death, Blake had passed out as the result of ingesting his usual maximum dosage of one 200 milligram and one 100 milligram Tuinal pills. Parenthetically, we note that the prescription of pills by the Long Beach podiatrist for Blake's sister, which pills were found in the Pinto just after his death, was for 100 pills of 200 milligrams each and that eight were missing.[3] In any event, according to the testimony of plaintiff, marital difficulties developed between her and her husband on July 5, 1973, when she discovered she was 98 percent sterile, apparently as the result of venereal disease. After this discovery, they experienced what plaintiff styled as "communications problems" and they commenced quarreling.

---

[3]The Aetna staff doctors who were consulted on the evaluation of the claim provided the opinion that eight 200 milligram pills of Tuinal would be a lethal dose. The toxicologist who examined the tissue and blood specimens following Blake's death concluded that ingestion of as many as eight 200 milligram Tuinal pills was consistent with what he had found from his analysis.

Getting back to Barrette's testimony, Blake had indicated in conversations with Barrette that he was "scared" that his present wife was "fooling around" with Paul Frank, a childhood sweetheart, and that this represented a pattern of history repeating itself, i.e., he had lost his first wife over another man. Blake related several times to Barrette his plan to overload himself financially in order to force his wife to go back to work and thus limit her opportunities to be unfaithful.

According to plaintiff, after she discovered that she could not have children, she began harboring memories and dreams about her childhood sweetheart. This influenced her moods and affected her relationship with Blake. She kept this to herself for months, but had finally revealed it to Blake. Soon thereafter there was a kind of meeting at the Blake home at which the plaintiff, Blake and Paul Frank, the childhood sweetheart, were present. The whole subject was discussed for the purpose of trying to resolve the difficulty. Frank's recollection of this meeting was that it occurred two weeks to a month before Blake's death. On this point plaintiff testified that Blake was willing for plaintiff to explore whether she loved Paul Frank and that if she did he, Blake, would be willing to "let [plaintiff] go."

On the day before Blake's death he and plaintiff entered into a real estate transaction to acquire a new house, the result of which would have been to increase their monthly house payment from $225 to $400. On the night before Blake's death he and plaintiff attended a neighborhood party at which an altercation of sorts took place as a result of some man's "making a pass" at plaintiff. After they had returned home, plaintiff went immediately to bed. Thereafter Blake came into the bedroom and said "I think we should talk about this." The plaintiff feigned sleep and declined to discuss with Blake whatever was troubling him. It was the following morning when he was found dead.

### AETNA'S HANDLING OF THE CLAIM

As above noted, the Aetna policy here involved was a group life and accidental death certificate written for Minnesota Mining and Manufacturing Company of which Blake's employer, Riker Laboratories, is a division. Upon learning of Blake's death, a 3-M employee in St. Paul, Minnesota, filled out and forwarded to the Aetna office in Minneapolis a proof of death form provided by Aetna. The form, accompanied by the original and amended death certificates, was forwarded with covering letter of September 24, 1974.

The Aetna form, among other things, provides for inscription of information under the following caption: "If death was accidental, please indicate the names of any other covered employees killed or seriously injured in the accident." Then follows another space captioned "REMARKS." Nothing was entered under remarks. The forwarding letter stated, "[w]e are enclosing a life and Accidental Death and Dismemberment claim for Thomas J. Blake, who is an employee of Riker, and who is insured under policy GT 47853. Please process and forward payments to my attention. [¶] If you have any questions, please do not hesitate to contact this department."

In response to the proof of claim, on October 2, 1974, Aetna issued its draft to plaintiff for $10,000 and forwarded it to the 3-M office in St. Paul. In due course the draft was delivered to plaintiff by Blake's employer. On the printed form of forwarding advice to 3-M, Aetna stated, "[w]e are investigating the possibility that Accidental Death and Dismemberment Benefits are payable. You will be notified of our decision as soon as possible."

Soon thereafter, Jack Powell, an Aetna assistant supervisor working out of its Orange, California, office, was instructed to initiate an investigation into the circumstances of Blake's death. Powell obtained copies of the coroner's investigation report and toxicology report and forwarded them to Aetna's office in Minneapolis. These items were received there on October 22, 1974. The toxicology report conclusively confirmed that the immediate cause of death was barbituric poisoning as specified on the amended death certificate. The coroner's report of his investigation filled most of two typewritten, legal length pages. Besides reciting the details and observations of the death scene, the report indicated that Deputy Harold Minick who wrote the report proceeded to the plaintiff's home soon after arriving on the scene, and his report contains the following: "[t]he decedent's wife was very upset at the time, however, she did make statements indicating that they had had an argument the night before, and further that he had been under pressure because of financial and domestic matters." The report otherwise stated, "Mr. Vernon Grim, 23306 Buckland, El Toro, California, communicated with the undersigned and stated that Tuinal capsules were found with the decedent's personal effects. He stated that there was a container which was prescribed on August 8, 1974 and that 8 of the capsules were unaccounted for. Mr. Grim did not have the identity of the physician who made the prescription. It was requested that he fur-

nish this information; however, the information was never forthcoming." The concluding statement reads, "[t]his death is classified as Undetermined."

Powell was instructed to pursue the investigation and on November 18, 1974, he reported to Minneapolis by means of an extended typewritten synopsis of what he had done. Powell inspected the area of the death scene. He then tried to telephone the plaintiff and learned that the line had been temporarily disconnected. Powell then telephoned the residence of Vernon Grim and talked to his wife to see what could be learned. Among other things, he found out that plaintiff was in the "east" and would return in December. However, much of what Mrs. Grim related otherwise was already in the coroner's report.

In the meantime, the entire file which had accumulated in Minneapolis, including the medical information and coroner's report, had been forwarded to Aetna's home office in Hartford, Connecticut, for final evaluation. In the covering memorandum of transmittal from the Minneapolis office to the home office in Hartford, it was stated, "I am not convinced that the death was the result of an accident, however, in discussing the investigation completed to date with the Orange County Office, I am advised that under the California Law, circumstances of this [sic] do qualify as such." There is no indication of just what "circumstances" were referred to in this interoffice memorandum, but the initial home office evaluation raised the question that death might have been caused by drowning, this notwithstanding the entry on the amended death certificate. On January 14, 1975, a request went forward to obtain the autopsy report as a means of resolving this question. Powell obtained a copy of the report, and on February 11, 1975, sent it back to Hartford. In that report, under "Lungs," it states, "[t]he lungs show a pulmonary edema but it is not the wet, moist edema of a drowning. Doesn't look like a drowning."

On February 19, 1975, William G. Parker, an Aetna senior analyst in Hartford, wrote to Powell acknowledging receipt of the autopsy report and instructing him to contact Grim to learn the name of the doctor who prescribed the Tuinal and to interview the doctor, "to determine what he was treating and also the emotional state of the deceased when the prescription was written." Parker added, "[w]e think, it would also be desirable to talk to the wife of the deceased to determine his emotional state on the evening preceding his death."

At about this same time Aetna's Minneapolis office learned that Equitable Life Assurance Society of New York had rejected a claim for accidental death benefits under another policy covering Blake. On February 24, 1975, Parker by telephone instructed the Minneapolis office to find out why Equitable had rejected the accidental death claim. By memo of March 7, 1975, an Aetna claim's representative in Minneapolis reported to Parker in Hartford. Among other things the memo recited, "[t]heir [Equitable's] denial states that their proofs and facts show that the death was not by an accident. Death was not caused by an external, violent, and purely accidental means as is required in the contract provisions."

By teletype of March 18, 1975, Parker nudged Powell, "[p]lease forward information requested my IOC 2-19-75. If an extended delay is anticipated, please advise." Powell was already attempting again to reach Grim to learn the name of the prescribing doctor. On March 17, 1975, he left his name and number with Grim's answering service. On March 19, 1975, he called again. Grim never returned those calls.

By teletype of March 20, 1975, Parker to Powell, the latter was instructed to "write widow and advise her we are still investigating. Tell her you would like to talk to her and ask her to get in touch with you." In compliance with this instruction Powell wrote to plaintiff on April 4, 1975, stating, "[w]e carry the group life-insurance on employees of the Riker Laboratories Division of 3 M Corporation, where your husband worked. [¶] It is necessary that I contact you to clarify several things concerning this matter. Please get in touch with me as soon as possible at (714) 835-3300. [¶] I am in my office in the afternoon from 1:30 to 4:20. Thank you." By teletype of April 18, 1975, Parker to Powell, the former asked, "[h]as widow contacted you? Please bring me up to date."

Soon thereafter Powell received a letter from Attorney Charles J. Crozier dated April 22, 1975, advising that he had been retained by the plaintiff in connection with the insured's estate and instructing Powell to "direct all inquiries to the attention of the undersigned." This letter was forwarded to Parker on April 30, 1975, with a request for any suggestions from Parker to Powell before the latter contacted Crozier. By teletype of May 7, 1975, Parker asked Powell to cover the questions already raised, i.e., the name of the doctor and permission to interview the widow.

Following his letter of April 22, 1975, Crozier wrote again to Powell under date of May 5, 1975, confirming that his office had been "retained by La Rinda Blake to assist her in coordinating claims against various insurance policies..." He also asked Powell to send copies to Crozier of any and all policies which Aetna had issued on the life of Blake. With memo of May 15, 1975, Powell forwarded this letter to Parker in Hartford. On May 28, 1975, Parker mailed to Crozier a copy of group policy GT 47853 and notified him that there were no other policies.[4]

Previously, on May 22, 1975, Powell telephoned Crozier's office and ended up talking to A. David Yardley, a member of Crozier's office staff. Powell reminded Yardley that Aetna had already requested the name of the prescribing doctor and data on the emotional condition of the insured at the time of his death. Yardley at the time of that conversation assured Powell that he would obtain and forward this information. This was reported to Parker in Hartford by memo of May 28, 1975. He reported also that Yardley was "going to secure a copy of the coroner's investigative and toxicology report, which they do not have as yet..."

Here we are constrained to editorialize directly to express amazement that Crozier, while purporting to represent plaintiff as her attorney in pursuing an accidental death benefit claim, as of May 22, 1975, had not yet even bothered to obtain the key official reports bearing on such a claim. We note also that neither the plaintiff nor her attorney, up to that time, had actually presented such a claim to Aetna. Blake's employer, apparently as an accommodation, had submitted the proof of loss form and the death certificates to Aetna, but no entry of any kind was made on the form, nor was any information contained in the forwarding letter of September 24, 1974, to indicate on what factual basis the death could have been characterized as accidental, more particularly that it was the "direct result of an injury caused by an accident" as specifically set forth in the policy.

Not having heard from Yardley following the May 22, 1975, call to him, Powell called again on July 8, 1975, only to learn that he was on

---

[4]Editorially, it can be observed here that at least by early June of 1975 Crozier became aware or could have become aware of the terms of the policy which obligated Aetna to pay the additional indemnity for accidental death *only* "upon receipt of due proof that death of the employee was a direct result of an injury caused by an accident."

vacation. Later in July Yardley did call Powell and reiterated that Crozier had delegated to him, Yardley, the task of handling the Blake matter. He promised again to obtain answers to Aetna's questions as soon as possible. This was reported by memo from Powell to Parker dated July 23, 1975.

Then on August 12, 1975, Crozier wrote an extended letter to Powell. In that letter he did not answer the actual questions which had been put to Yardley, but said that it was his understanding that Aetna was seeking clarification of certain matters dealt with in the coroner's report. In particular, he noted various statements attributed to the plaintiff as recited in the report and then proceeded to make certain self-serving refutations of those statements which added up to assertions that Blake at the time of his death was a happy, well-adjusted man, enjoying marital bliss and free of any financial problems. Parenthetically, this was all in direct contradiction to the extended testimony of Richard Barrette and the plaintiff herself. In any case, this letter was forwarded to Parker in Hartford on August 20, 1975.

By teletype of August 26, 1975, Parker asked Powell if anyone had contacted the coroner to amend the death certificate to show the cause of death as accidental. He also directed Childs in the Minneapolis office to see if the group health carrier had processed any medical claims by Blake before his death. By memo of September 12, 1975, Powell informed Parker that there had been no such amendment to the death certificate.

By teletype of October 3, 1975, Parker asked Powell if there were anything new to report on the pill bottle. He also instructed Powell to check with the Equitable office in Los Angeles on the medical claims question. By memo of October 15, 1975, Powell informed Parker that the only medical claim presented by Blake to Equitable had been in 1973 for services rendered for treatment of a deviated nasal septum. By memo of October 30, 1975, Powell reported to Parker that he had talked to Yardley by telephone and that Yardley had related that he had written to Grim about the pill bottle but had received no reply. According to Powell, Yardley promised to write again to Grim. This was confirmed by letter from Yardley to Powell dated October 28, 1975.

However, by letter of October 23, 1975 (apparently not received by Powell before Oct. 30), Crozier wrote to Powell in a completely differ-

ent tone than theretofore. The letter noted that Crozier had received no reply to his (self-serving) letter of August 12, 1975, and then made a formal demand for payment of the $10,000 accidental death benefit. Parenthetically, we observe that this was the first assertion on plaintiff's behalf of any entitlement to the accidental death benefit. The letter concluded with the assertion, if there were not a timely reply to the demand, that the plaintiff had authorized suit to collect it. This letter and Yardley's of October 28, 1975, were forwarded to Parker with memo of November 11, 1975.

On November 26, 1975, D. V. Lion, a senior analyst in Aetna's Hartford office, picked up the investigation. He called Powell's office and directed Powell to contact Crozier and to ask why he was pressing a demand when he had not yet supplied the promised information on the pill bottle. Powell was also instructed to contact Blake's employer to see what could be learned there. Powell called Lion on December 1, 1975, and Lion made a full memorandum of the call which in essence involved renewing the instructions to try to locate the doctor who prescribed the Tuinal to learn why it was prescribed, and to interview the employer.

Under date of December 3, 1975, Lion replied to Crozier's letter noted and stated, "[w]e have been working through your office to compile the necessary information to arrive at a determination of this claim. You have been attempting for some time to ascertain the background and real reason why the deceased had the 'container' on his person." The letter also noted, "[a] review of the available evidence including the Coroner's Investigation, Toxicology Report and Autopsy Report fails to substantiate the accidental criteria of this contract. All of the aforementioned reports were inconclusive as to whether or not the insured's demise was the result of an accident." The letter further stated that Aetna would advise of its determination of the claim upon receipt of all requested information. Crozier replied to this letter under date of December 11, 1975, and its contents are nothing less than astounding. Actually, it is so startling that we deem it appropriate to set forth the letter in full.

"Please be advised that this office is in receipt of your correspondence addressed to it and dated December 3, 1975, in re the above captioned matter.

"In response to your first paragraph, this office is not and has never attempted to ascertain the real reason why the deceased had the container on his person. It is the opinion of this office that such an investigation would be fruitless and, more importantly, totally immaterial to Mrs. Blake's claim.

"As you are aware, on or about August 11, 1974, while the above mentioned group policy was in full force and effect, Mr. Blake died. A review of the available evidence, including the Coroner's Investigation, the Toxicology Report and the Autopsy Report, fails to reveal any determination that Mr. Blake's death was caused by other than accidental means. Please refer to correspondence addressed to J. R. Powell, Assistant Supervisor of the Orange County Offices of Aetna Life and Casualty dated August 12, 1975, wherein this office expresses firm belief that Mr. Blake's economic and emotional stability prior to his death can and will be adequately substantiated. In view of the above, a presumption exists that Mr. Blake died from none other than accidental causes.

"With respect to your request to 'forward the information we requested from your office in October', please be advised that this office has received no reply to its second inquiry propounded to Mr. Grimm [sic] which requested the name of the physician reflected on the container found among the decedent's personal effects. At the request of J. R. Powell of Aetna Life and Casualty, this office had attempted to obtain that information as a courtesy and as evidence of our good faith intentions in resolving our client's claim. We do not intend to share the burden of Aetna's investigation any further as this office is under no obligation to obtain, on behalf of Aetna, information from individuals other than our client.

"A claim has been made for the full benefits available under your group policy no. GT-47853 on behalf of Mrs. Blake. Nearly 16 months have elapsed since the date of Mr. Blake's death and no offer or payment of benefits have been received from your company. This office believes that Aetna's omission to act in response to this claim is a classic example of bad faith and failure to deal fairly under the terms of the above mentioned accidental death policy. As a direct result of Aetna's conduct, Mrs. Blake has suffered substantial damage to her financial and property interests causing her to experience emotional distress.

"Based upon this position, this office has filed suit and your company may expect service of the Summons and Complaint within the immediate future.

"Should you have any questions concerning this matter, please contact this office at your earliest convenience."[5]

THE EVIDENCE OF ALLEGED DAMAGES

In terms of any possible financial hardship flowing from nonpayment of the accidental death benefit, plaintiff was asked at the trial, "Did not having the $10,000 cause you any financial hardship at the time?" She replied, "I really don't remember what year that was. I can't say for sure that it did cause me financial hardship at that time, no." Otherwise, the record shows that in the latter part of 1974 plaintiff went on an antique buying trip to the midwest with Paul Frank and there spent $10,000 on antiques to put in Frank's antique shop at Laguna Beach on consignment. In the summer of 1975 plaintiff advanced $7,000 on behalf of Frank for the improvement of certain real estate in Long Beach.

With reference to any alleged emotional distress suffered because of nonpayment of the accidental death benefit, plaintiff testified in effect that she was outraged as a result of her understanding that the claim had been denied because Aetna had contended that Blake's death was a suicide. In this latter connection there was no direct evidence that Aetna ever communicated such a denial either to plaintiff or her attorney. Plaintiff's testimony here was vague and evasive. She claimed that at one time during the first part of 1975 her attorney had showed her a communication between Aetna and her attorney indicating that Aetna had denied the claim on the grounds of suicide. No such letter was ever introduced in evidence and neither the file on the claim compiled at

---

[5]We find this letter to be unusual for it comes after Crozier's explicit instructions to Aetna in letter of April 22, 1975, "to direct all inquiries [about the claim] to the attention of [Crozier]." The letter is also remarkable in that it asserts without explaining why that the reason Blake had the pill bottle in his possession was "immaterial" to the claim. Finally, Crozier disclaimed any responsibility to investigate the claim beyond obtaining information from his client, this despite the clear condition in the policy precedent to payment of any accidental death benefit. We note again that the only factual data supplied by plaintiff and her attorney in support of the demand of October 23, 1975, for the accidental death benefits were the self-serving statements attributed to plaintiff in Crozier's letter of August 12, 1975, statements which plaintiff herself in essence contradicted by her testimony at the trial. The proof of claim submitted to Aetna by Blake's employer, the only proof ever submitted on behalf of plaintiff, made no reference or claim whatsoever that death was accidental.

Aetna's home office nor the file of its investigation in Orange County contained such a letter. There was no evidence that plaintiff was ever emotionally distressed by the nonpayment itself.

ISSUES AND DISCUSSION

In our view, the principal and ultimate issue on this appeal is the propriety of the jury's award against Aetna on the "bad faith" count. The contentions raised by the plaintiff on her appeal are marginal at best, in light of the record, and will be disposed of summarily at the end of this opinion.

■ As a kind of preface to resolution of the issues raised by Aetna's cross-appeal challenging the award against it on the "bad faith" count, it is accurate to observe that our opinion in *Austero* v. *National Cas. Co.*, 84 Cal.App.3d 1 [148 Cal.Rptr. 653],[6] was a seriously deliberated effort to spell out clearly what we see to be the true gravamen of tortious behavior in so-called "bad faith" cases decided against insurance companies. That gravamen is found in the *unreasonable* conduct of the carrier measured against its duty arising under the implied covenant of good faith and fair dealing present in every insurance contract. (*Id.* at p. 26.)

Turning then to the case before us, Aetna argues first, with reference to the bad faith count, that the evidence, as a matter of law, was insufficient to demonstrate that it had acted unreasonably in its handling of plaintiff's double indemnity claim. It argues second that the evidence, as a matter of law, failed to demonstrate that plaintiff had suffered any damages arising from emotional distress proximately caused by nonpayment of the double indemnity claim.

In addressing the first issue noted, the starting point in measuring the duty of Aetna and any alleged breach thereof is the language of the policy. In other words, "to determine the nature and extent of [Aetna's] duty to act fairly requires a careful scrutiny of the kind of contractual obligation arising under the policy." (*Austero* v. *National Cas. Co., supra*, 84 Cal.App.3d 1, 27.) Here, the language of the policy which spelled out the condition precedent to Aetna's duty to pay the double indemnity benefit is clear beyond ambiguity. Such duty to pay could

---

[6]Disapproved on other grounds in *Egan* v. *Mutual of Omaha Ins. Co.*, 24 Cal.3d 809 [157 Cal.Rptr. 482, 598 P.2d 452].

only have arisen "upon receipt of due proof that the death of the [insured] was a direct result of an injury caused by an accident." This conditional duty was further circumscribed by certain exclusions. The policy provided that the double indemnity benefit would "not be payable if death resulted from an injury caused or contributed to by...suicide or any attempt thereat...."

While it is clear from this policy language that any duty to pay the double indemnity claim would only follow "upon receipt of due proof" that Blake's death was an accident and not a suicide, it remains to determine whether Aetna acted unreasonably with reference to the development of such proof, keeping in mind that neither plaintiff, nor her attorney, nor Blake's employer ever came forward with any kind of showing that death was accidental.

For purposes of assessing Aetna's performance of its duty to act in good faith, we regret that it was necessary to set out in tedious detail the entire chronology of what was done by Aetna in its efforts to reach an informed conclusion on whether this death was an accident or a suicide. However, there is no other way to make an assessment of whether Aetna's continuing nonpayment was reasonable.

In responding to the cross-appeal plaintiff first observes that we must affirm the judgment if it is supported by substantial evidence. That of course begs the question of whether there is any substantial evidence to support the judgment. Therefore, what does plaintiff point to as evidence of Aetna's bad faith refusal to settle? In her brief she says that "investigation by the defendant was incomplete, and dilatory, and payment was never made to the plaintiff, although approximately sixteen months had passed from the date of death until the action at hand was filed. Delay, should, and must be tantamount to denial at some point in time, and delay in providing benefits may be subject to a finding of bad faith and support punitive damages just as well as an improperly denied claim." For this proposition we are cited to *Delos* v. *Farmers Insurance Group*, 93 Cal.App.3d 642 [155 Cal.Rptr. 843].

We have read *Delos* carefully and nowhere find the proposition therein stated for which it has been cited by plaintiff. That case involved a claim under supposed uninsured motorist coverage where there was considerable confusion surrounding whether such coverage existed. Contrary to the facts before us, the parties who were asserting coverage

took the initiative to demonstrate the validity of their claim. The insurance company's response to that effort can fairly be described as a "run around," and this was the basis for an award of "bad faith" damages.

In any event, the quoted language from plaintiff's brief could very well lead into a detailed discussion of the evidence, one which would support or demonstrate that the investigation was incomplete and dilatory. However, there is no such discussion; we are directed to no evidence in the record which would purport to substantiate the plaintiff's generalized indictment of Aetna's handling of the claim as dilatory.

We are thus thrown back upon our own assessment of Aetna's handling of the claim. In making such an assessment, it is our view that this is not even a close case. It is difficult to imagine what Aetna could have done which it did not do, up to the time the complaint was filed, to find out all the circumstances leading up to Blake's death. This is especially underscored by the fact that Crozier instructed Aetna to make all inquiries through his office. In this connection, it seems to us that interviewing the doctor who prescribed the Tuinal was central to the investigation, and the record is clear that the plaintiff and her attorney made no meaningful effort at all to bring about such an interview. On the other hand, the inference is clear that Grim, the plaintiff's father, grasped at once the central significance of the pill bottle together with the prescription behind it, and, realizing that significance, made himself scarce.

Conceivably, Aetna could have contacted Blake's employer sooner. However, that was hardly prejudicial, for everything which Barrette had to say overwhelmingly pointed to the probability of suicide. If Aetna had had the benefit of this evidence at the outset of investigation, its decision not to pay the accidental death benefit would have been effectively reinforced as reasonable.

There were two items of documentary evidence which arguably provided the predicate upon which the trial court allowed the bad faith count to go to the jury. In concluding his November 18, 1974, internal office memo to Aetna's Minneapolis office, Powell said, "I think this is one where we will never really know whether this man was a suicide or he accidentally killed himself with an overdose." The second has already been noted. It was the observation of J. L. Childs of Aetna's

Minneapolis office in the memo under which the entire file was transmitted to the home office in Hartford for final evaluation in which he said, "I am not convinced that the death was the result of an accident, however, in discussing the investigation completed to date with the Orange County Office, I am advised that under California Law, circumstances of this [*sic*] do qualify as such."

Passing the exception taken by Aetna to the admission of these items into evidence, the question here pertinent is whether Aetna's nonpayment in the face of these statements constituted any evidence of bad faith. We hold not. Certainly Powell's observation did nothing but leave the question of how death occurred up in the air. As for Childs', there is nothing in his statement to indicate what circumstances he was talking about; neither was there any revelation of what "California Law" he was referring to. In any case, the first step taken by the home office was to look into the possibility of a drowning by ordering the autopsy report. As earlier indicated, that report ruled out drowning.

Otherwise, at that point in time Aetna was faced with an inconclusive coroner's report as to the occasion of death. They knew that the probabilities were that Blake had ingested eight 200 milligram tablets of Tuinal at one time, an amount equal to a lethal dose. As of that time they were confronted by contents of the coroner's report attributing statements to the wife about financial pressure and domestic discord. Moreover nothing, no showing of any kind, had been made by plaintiff to support a claim of accidental death; beyond that she would not even make herself available to relate what she knew of the events leading up to Blake's death. Especially telling was the continuing elusiveness of plaintiff's father Vernon Grim, who was identified in the coroner's report as having the pill bottle and who, despite having been requested to do so, had not reported to the coroner the name of the prescribing doctor. With this the state of the investigation as of the time of Child's memo, we see nothing at all unusual about Aetna's decision not to pay but to continue the investigation. Beyond acting in good faith at that time, Aetna would have been improvident with its stockholders' assets in paying the claim on the basis of how little it knew.

We therefore come back to Aetna's contention that the evidence as a matter of law was insufficient to show that it acted unreasonably in its handling of the claim. On the record before us the contention is irrefutable.

In assessing the reasonableness of Aetna's conduct, it is necessary to keep in mind that Aetna never denied the claim, but persisted in seeking information essential to a determination of its merits. This is not an instance where the insurer withheld or threatened to withhold payments unreasonably for the purpose of injuring the insured by depriving him of the benefits of the policy. (Cf. *Fletcher* v. *Western National Life. Ins. Co.*, 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) Nor are the facts here similar to those in *Gruenberg* v. *Aetna Ins. Co.*, 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032], where the insurer encouraged criminal charges by falsely implying a motive to commit arson and then used the insured's failure to appear at an examination during the pendency of the criminal charges as a pretense for denying liability. Nor are these facts similar to those in *Silberg* v. *California Life Ins. Co.*, 11 Cal.3d 452, 460 [113 Cal.Rptr. 711, 521 P.2d 1103], where, during the pendency of a worker's compensation proceeding, the insurer refused to advance payments under a policy intended to protect against medical bills, despite the fact that the insured lacked funds for necessary hospitalization. Instead, the facts here reveal that Aetna, although having been provided with no proof of accidental death by plaintiff, continued to investigate the claim even up to the time the complaint was filed. The evidence clearly indicates that in pursuit of this investigation Aetna made numerous attempts to obtain information and cooperation from plaintiff and plaintiff's attorney, all to no avail.

In addition to establishing that Aetna's handling of the claim here was reasonable as a humane matter, the facts also establish as a matter of law that Aetna acted reasonably in withholding payment on the claim. Coverage under the insurance policy was excluded if suicide or medical treatment caused or contributed to the death, even though the death may also have been caused or contributed to by an accident. Further and of more significance here, the policy by its express terms placed upon plaintiff the burden of providing due proof both that the death was caused by an accident and that it was *not* caused, contributed to, or a consequence of suicide or medical treatment. Although Blake's employer implied in its letter transmitting the proof of death claim that accidental death benefits were payable, due proof that death resulted from an injury caused by an accident and not a suicide was never furnished by the employer, by plaintiff, or by her attorney.

In *Zuckerman* v. *Underwriters at Lloyd's*, 42 Cal.2d 460, 467 [267 P.2d 777], the action was to recover for an accidental death benefit

where the insurance company had refused to pay. The policy included a provision very similar to the one here in which an exclusion stated that "'[t]his certificate does not cover death, injury or dismemberment: [¶] (b) Directly or indirectly caused or contributed to by intentional self in- jury disease or natural causes, suicide or attempted suicide...'"

The issue in *Zuckerman* turned on the burden of proof, and with ref- erence to the burden of proof, the beneficiary argued that the *insurer* was required to prove that death resulted from intentional self injury because that cause of death was excluded under the policy. To this the court said, "[o]rdinarily the burden is upon the insurer to prove a true excepted cause or excluded risk in order to defeat liability upon that ground. [Citations.] The question for decision, therefore, is whether, under the present policies, death occasioned by either intentional self-injury or disease, is death by reason of an excepted cause. [¶] The policies here insured against 'accidental bodily injury [including "bodily injury which shall occasion death" as defined in the policies] caused by accident.' 'Accident' has been defined as 'a casualty—something out of the usual course of events and which happens suddenly and unexpect- edly and without any design of the person injured.' [Citations.] Basical- ly, these policies are contracts insuring against accident, and it need not be here determined whether they can be characterized as insuring against 'accidental death' or only against 'death effected by accidental means.' [Citation.]...'Suicide, at least when sane, is not accidental death. A plaintiff under [a] policy [like this one] has the burden of proving an accidental death thereby negativing suicide.' [Cita- tions.]...The burden of establishing suicide, therefore, should not have been put upon the insurer, as the provision as to death from that cause was not a condition subsequent, but merely definitive of the precise risk assumed. [Citation.]...For these reasons, under the policies here sued upon, death occasioned by intentional self-injury...is not one which oc- curs by reason of the excepted causes. The 'exclusionary clause' is the antithesis of the 'insuring clause.' If [the insured] died as the result of an accident, death was not occasioned by intentional self-injury...Con- versely, if intentional self-injury...caused his death, it did not result from an accident within the meaning of the policy." (*Zuckerman v. Un- derwriters at Lloyd's, supra*, 42 Cal.2d 460, 472-476.)

In addition to approving instructions to the jury in accord with the foregoing, *Zuckerman* took occasion expressly to overrule certain cases inconsistent with the proposition just quoted. (*Id.* at p. 474.) More re-

cently, the *Zuckerman* rule, placing the burden of proving accidental death upon the beneficiary under a policy with a suicide exclusion, was cited in *White* v. *Aetna Life Ins. Co.*, 198 Cal.App.2d 370 [17 Cal.Rptr. 914], wherein an order granting a new trial to Aetna was affirmed on appeal after entry of a judgment for the plaintiff beneficiary awarding an accidental death benefit.

From the foregoing, we discern the rule, in terms of the burden at trial that such burden rests upon the plaintiff to prove that the death was not a suicide. With that the plaintiff's role, should the claim finally have to be resolved in the courtroom, it was not unreasonable for Aetna to take the position at any given time before trial that good faith doubts as to whether the death was an accident or a suicide should be resolved against the claimant. Surely in such cases the duty of good faith and fair dealing equally devolving upon the insured or his beneficiary (see *Liberty Mut. Ins. Co.* v. *Altfillisch Constr. Co.*, 70 Cal.App.3d 789 [139 Cal.Rptr. 91]) requires the claimant to do something by way of coming forward with an articulated theory of why the death was accidental. Absent that, it is difficult to see just how Aetna could be charged with bad faith because it withheld payment until it could find out on its own, to a measure of certainty, that death had been an accident and not a suicide.

Therefore, in the absence of evidence showing that the death was not a suicide, Aetna acted reasonably in withholding payment and continuing to investigate while it yet remained willing to pay the claim upon discovery of persuasive facts that death was accidental. Aetna thereby satisfied both its obligation to the plaintiff to act fairly and in good faith and its obligation to other policy holders and to stockholders not to dissipate its reserves through the payment of meritless claims. (*Austero* v. *National Cas. Co., supra*, 84 Cal.App.3d 1, 30.)

■ As its second major contention on the cross-appeal, Aetna argues, even assuming arguendo there was evidence of bad faith, that otherwise the evidence does not support a determination by the jury that plaintiff suffered any damages for emotional distress proximately caused by nonpayment of the accidental death benefit.

Plaintiff's own testimony provided the only evidence presented on the issue of damages. She herself disclaimed any financial hardship as a consequence of such nonpayment. By her own testimony, her grievance

was directed toward her impression that the claim had been denied because of her husband's suicide. She testified that she was "outraged at anybody considering the fact that [Blake] could have taken his own life." All of the physical symptoms she complained of, sleeplessness, loss of weight, nightmares, an ulcer condition, were all by her own testimony traceable to this outrage. To recap the plaintiff's own testimony on this issue is to demonstrate that none of these sufferings was proximately caused by the nonpayment of the claim.

In the customary "bad faith" case, the essence of the plaintiff's emotional distress is the anxiety arising from the financial deprivation traceable directly to nonpayment of the claim. This was dramatically the situation in *Silberg* v. *California Life Ins. Co., supra*, 11 Cal.3d 452. On the contrary here, the uncontradicted evidence shows, soon after the death of Blake, that plaintiff spent $10,000 on antiques and that less than a year after his death advanced $7,000 on behalf of a friend for improvement of certain real estate. This hardly presents the picture of a widow distraught with anxiety over financial problems.

Based upon the foregoing, it is our holding that the bad faith count should never have gone to the jury. In the first instance as a matter of law there was no evidence of unreasonable conduct by Aetna, either of omission or commission, in handling the claim for the accidental death benefit. In the second instance, even if there had been, the evidence conclusively demonstrated that plaintiff suffered no damages for emotional distress proximately caused by nonpayment of the accidental death benefit claim. Plaintiff testified to no consequential damages arising from nonpayment of the claim. She merely made a naked assertion that she was distressed because of a reported denial, not documented, of her claim for the reason that her husband had committed suicide. Under no cases cited by plaintiff and under none we know of does this prove a right to relief in a first party, bad faith case against an insurance company. (Cf. *Crisci* v. *Security Ins. Co.*, 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173]; *Jarchow* v. *Transamerica Title Ins. Co.*, 48 Cal.App.3d 917 [122 Cal.Rptr. 470].)

Thus, the trial court, having denied the motion for a nonsuit on the bad faith count and also having denied a motion for a directed verdict therein, should have granted the motion for judgment notwithstanding the verdict as was done in *Merritt* v. *Reserve Ins. Co.*, 34 Cal.App.3d 858, 879 [110 Cal.Rptr. 511].

PLAINTIFF'S APPEAL

■  As stated in plaintiff's opening brief, "[t]he only issues submitted by plaintiff as an Appellant are those issues pertaining to the Court's ruling which excluded evidence which pertained to punitive damages and attorney's fees..." More particularly, as to the former, when plaintiff attempted to introduce evidence on the financial condition of Aetna, Aetna objected on the ground that no foundation had been laid for the relevance of such evidence for the reason that there had been no showing of oppression or malice by Aetna in handling the double indemnity claim. The trial court sustained the objection, and plaintiff assigns that ruling as error. Actually, in our view, the action more properly assigned as error in order to raise the real issue was the trial court's refusal to instruct on exemplary damages.

As pertinent to the latter basis for appeal above noted, plaintiff attempted to introduce evidence purportedly in support of her prayer for attorney's fees tabulated under count two, i.e., the bad faith count. Aetna objected to such evidence, and the trial court sustained the objection on the stated ground that an effort to recover attorney's fees in the action itself was not proper as part of an action on the insurance contract containing no provision for attorney's fees.

In view of our holding above, as a matter of law, that there was no evidence that Aetna acted unreasonably in withholding payment of the accidental death benefit claim, plaintiff's contentions raised on her appeal have been necessarily by such holding resolved against her. In other words, without evidence of bad faith, a fortiori there could not have been any evidence of malice or oppression. (*Austero* v. *National Cas. Co., supra,* 84 Cal.App.3d 1, 36.)

■  Likewise, without evidence of bad faith, there can be no consequential damages thereof, including attorney's fees.

DISPOSITION

With reference to plaintiff's appeal, the judgment is affirmed.

With reference to Aetna's appeal, the judgment on the second count of the first amended complaint is reversed with directions to the trial

court to vacate its order denying the motion for judgment notwithstanding the verdict on that count, and to enter a new and different order granting such motion, following which, judgment shall be entered in favor of Aetna on the second count.

Aetna shall recover its costs on both appeals.

Kaufman, Acting P. J., and Morris, J., concurred.