[Civ. No. 69334. Second Dist., Div. Seven. Mar. 29, 1984.]

LEROY McCORMICK, Plaintiff and Appellant, v.
SENTINEL LIFE INSURANCE COMPANY, Defendant and Respondent.

**COUNSEL**

James A. Jensen for Plaintiff and Appellant.

Parkinson, Wolf, Lazar & Leo, Roger A. Parkinson, Gordon J. Calhoun and Heidi D. Hutchinson for Defendant and Respondent.

## Opinion

**JOHNSON, J.**—Appellant filed an action for declaratory relief and damages for insurance bad faith. After an adverse compulsory arbitration hearing, appellant requested a trial de novo. He challenges both an order denying postarbitration discovery and an order granting the insurer's motion for summary judgment. We affirm the first order and reverse the latter.

The order granting summary judgment raises a significant question about the scope of an insurer's duty of good faith. In this connection we hold an insurer's duty is not necessarily excused where an item of information is omitted from a claim form. We also hold where there is such an omission the insurer's duty may, in some circumstances, include a responsibility to conduct an independent investigation of the insured's claim for benefits. Finally, we reject the contention a finding of bad faith is precluded simply because the insurer unduly delays paying benefits rather than denying them outright.

### I. STATEMENT OF FACTS AND PROCEEDINGS BELOW[1]

In July of 1976 appellant, Leroy McCormick, borrowed money from Enesco Federal Credit Union (the credit union) to buy a pickup truck and camper. Loan payments were to be made by payroll deductions. In connection with the loan McCormick purchased a credit disability insurance policy from respondent, Sentinel Life Insurance Company (Sentinel), as security for payment of the loan. The policy provided in the event McCormick was totally disabled Sentinel would make the payments on the credit union loan up to a maximum period of 30 months. This insurance was purchased through the credit union. The credit union also administered the premium payments.

On April 6, 1977, McCormick, then employed as a machinist, was injured. About one month later, when the credit union did not receive McCormick's loan payment in the form of a payroll deduction, the credit union's agent assumed McCormick was disabled and claim forms were sent to him two months later on July 7, 1977.

Apparently McCormick did not fill out the claim form until October 24, 1977, over three months after it was mailed.[2] He forwarded the form to his doctor, who completed it on October 25, 1977. The doctor attested to a

---

[1]Since this appeal arises in the context of a motion for summary judgment some of the "facts" recited in this opinion will be subject to proof in later proceedings.

[2]The claim form was signed and dated by McCormick on October 24, 1977.

total disability from April 6, 1977, through November 25, 1977. The portions of the form not completed by the doctor consisted of (1) the dates of medical treatment; (2) whether McCormick had similar symptoms earlier; and (3) the name of the referring doctor. McCormick's employer completed its portion of the form on December 28, 1977, and indicated McCormick was still not working. The employer also indicated McCormick's accident consisted of his being pulled into a lathe.

It also appears both that McCormick returned the form to the credit union rather than to Sentinel, and that the credit union forwarded the form to Sentinel on January 2, 1978. Thus, by the time Sentinel received the claim form, nine months had elapsed from the day of McCormick's industrial accident. Sentinel's records indicate, however, it was aware a disability claim had been filed on McCormick's behalf on June 28, 1977, less than two months after the accident.[3]

Prior to Sentinel's receipt of the claim form, McCormick received various letters from either Sentinel or the credit union which advised him the insurance claim had been closed, his credit union loan was in arrears, the insurance claim had been reopened, he should complete another insurance claim form, and the insurance claim had once again been closed. It appears some of the letters from Sentinel were addressed to McCormick in care of the credit union.

On February 3, 1978, a month after the credit union forwarded McCormick's claim form to Sentinel, the insurer notified McCormick the form had been received but benefits could not be paid until McCormick's doctor filled in the dates of medical treatment. The only reason for nonpayment, according to the February 3d letter, was the doctor's failure to include treatment dates. This letter of notification was sent to the credit union rather than to McCormick.

Between February 9 and March 2, 1978, McCormick sent a revised claim form to the credit union rather than to Sentinel. The requested dates of medical treatment had been supplied. But they were filled in by McCormick's attorney rather than the doctor who treated him.

On March 2, 1978, the credit union returned the revised form to McCormick claiming it did not indicate a disability of at least 30 days.[4] Sentinel

[3]See footnote 12, *infra*.

[4]The basis for the credit union's concern about the length of McCormick's disability is unclear. It appears undisputed after McCormick's industrial accident he was hospitalized for 10 days and underwent physical therapy after his release. Moreover, in the revised physician's statement, as in the earlier statement, the doctor indicated a total disability of over seven months, from April 6, 1977, through at least November 25, 1977. During oral argument Sentinel nevertheless persisted in arguing McCormick had not been disabled over 30 days. Obviously this is a factual issue which cannot be properly resolved on a motion for summary judgment.

claims it was not aware the credit union had either received or returned the revised form. The failure of communication between the parties was characterized as follows by Sentinel in its brief on appeal: "McCormick was unaware that he was insured by Sentinel as late as September 18, 1979. McCormick believed Enesco, his credit union, was the insurer, which probably explains why Sentinel never heard from McCormick . . . until [he] filed suit."

On March 15, 1978, the credit union wrote McCormick advising him the truck and camper would be repossessed if his account was not brought current within five days. Twelve days later, on March 27, 1978, the credit union did repossess the truck and camper.

On April 4, 1978, McCormick brought suit against the credit union and Sentinel for declaratory relief and insurance bad faith. The credit union stipulated that McCormick's claims against the credit union would be governed by the results of this appeal.

In answer to the complaint, Sentinel asserted McCormick never submitted a proper claim for benefits. Sentinel also filed a cross-complaint against the credit union for indemnity on the basis of its failure to forward the insurance claim form to Sentinel.

On January 24, 1980, the controversy was submitted to compulsory arbitration. (Code Civ. Proc., § 1141.10; Cal. Rules of Court, rule 1605.) The arbitrator ruled McCormick failed to submit proper insurance forms and accordingly Sentinel did not breach its covenant of good faith. On the cross-complaint the arbitrator ruled if McCormick was later awarded a judgment, Sentinel was entitled to be indemnified by the credit union.

After the adverse results of the arbitration, McCormick filed a request for a trial de novo. (Cal. Rules of Court, rule 1616.) Trial was set for August 2, 1982.

McCormick then filed a motion to allow additional discovery. (Code Civ. Proc., § 1141.24.) The motion was denied on the ground McCormick failed to show good cause for allowing further discovery after a judicially mandated arbitration. (Code Civ. Proc., § 1141.24.)

On June 3, 1982, Sentinel filed a motion for summary judgment. The insurer argued the undisputed facts of the declaratory judgment action showed it was relieved of its obligation to pay the policy benefits by McCormick's failure to satisfy his contractual obligations. Sentinel also argued the undisputed facts refuted the bad faith claim.

Included in McCormick's opposition to the motion was a declaration from John S. Murphy, an insurance claims investigator with 24 years of experience. Mr. Murphy expressed the opinion that under accepted practice in the insurance industry Sentinel should have conducted an independent investigation to fill in any information not supplied by McCormick's doctor. He also pointed out the certificate of insurance did not even require McCormick to provide a doctor's statement. According to Mr. Murphy, the insurance certificate gave notice that a claimant would be required to fill out a claim form but contained no reference to a doctor being required to fill out portions of the form.[5] Mr. Murphy concluded: "Sentinel had absolutely no basis for playing a waiting game with their insured and his physician. [B]y their inaction plus letting the credit union do all their work and by not making every effort to contact the insured and his doctor direct. . . . [t]heir action was indicative of their extreme lack of concern for Mr. McCormick's rights and was most definitely not in accordance with both the standard practice in the industry and good claims practice."

The court below granted the motion for summary judgment on July 26, 1982.

McCormick filed a timely notice of appeal from both the order denying additional discovery and the order granting the motion for summary judgment.

## II. SUMMARY JUDGMENT WAS NOT PROPER SINCE A TRIABLE ISSUE EXISTS AS TO WHETHER SENTINEL'S CONDUCT CONSTITUTES BAD FAITH.[6]

In a recent case this court examined the standards for reviewing an order granting summary judgment (Code Civ. Proc., § 437c):

██ "The summary judgment procedure, inasmuch as it denies the right of the adverse party to a trial, is drastic and should be used with caution.

---

[5]Two provisions of the insurance policy (which consists of print so small it is difficult to read) refer to the possibility medical evidence will be required to support a disability claim. The first such provision provides: "The Company reserves the right to require medical evidence, from a legally qualified physician or surgeon, other than debtor, of actual Total Disability as defined herein at reasonable intervals in order to justify the *continued* payment of benefits." (Italics added.)

The second such provision provides: "PHYSICAL EXAMINATIONS AND AUTOPSY. The Company, at its own expense, shall have the right and opportunity to examine the person of an insured Debtor when and as often as it may reasonably require during the pendency of a claim hereunder . . . ."

[6]Our disposition of this issue makes it unnecessary to decide McCormick's contention the order granting the motion for summary judgment was erroneous on the ground the motion was untimely.

Summary judgment is properly granted only when the evidence in support of the moving party establishes that there is no issue of fact to be tried.

■ "'The moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.' 'The affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of summary judgment should be resolved against granting the motion.'" (*Gomez* v. *Ticor* (1983) 145 Cal.App.3d 622, 626-627 [193 Cal.Rptr. 600]; citations omitted.) We proceed by examining this record to determine whether triable issues of fact exist. We conclude there are triable issues and the order granting summary judgment was error.

A review of the record and the arguments advanced by the parties on appeal reveals this dispute consists primarily of either (1) allegations McCormick's doctor failed to include two dates on the insurance claim form; or (2) allegations Sentinel failed to investigate the claim in a timely fashion; or (3) allegations the credit union failed to forward McCormick's claim forms to Sentinel. The record also discloses all of the parties contributed to the delay and confusion in processing McCormick's claim for coverage.

The credit union's dilatory conduct consisted of the following: (1) waiting two months after it became aware McCormick was disabled to mail the first claim form to McCormick; and (2) failing to forward the revised claim form to Sentinel when the credit union finally received it from McCormick, 13 days before repossessing the truck and camper.

Sentinel's dilatory conduct consisted of the following: (1) although Sentinel may have been aware McCormick had a disability claim as early as June 1977,[7] it made no attempts to contact anyone; (2) when Sentinel finally received McCormick's claim form, nine months after the industrial accident, it returned the form to the credit union rather than to McCormick; and (3) rather than conducting its own investigation it returned the form solely because two dates had been omitted by McCormick's doctor.

McCormick's dilatory conduct consisted of waiting approximately three months before sending the original claim form.

Before proceeding any further we emphasize the gist of Sentinel's arguments to this court and the court below concerns McCormick's failure to supply a single item of information on the claim form he submitted. Neither party has argued the merits of McCormick's entitlement to disability benefits in any detail. In addition, Sentinel has argued it never denied Mc-

---

[7]See footnote 12, *infra.*

Cormick's claim. Sentinel characterizes its actions as a mere delay in resolving the claim and asserts it thus cannot be accused of bad faith.

The arguments which have been advanced raise the following four issues: first, whether Sentinel is responsible for the dilatory and/or negligent conduct of the credit union;[8] second, whether Sentinel's obligation to pay benefits is excused by McCormick's failure to submit certain information it requested on the claim form in the exact way it wanted that information; third, whether Sentinel's duty of good faith and fair dealing included a duty to itself investigate the merits of McCormick's claim for benefits; and finally, whether a finding of bad faith is precluded where an insurer never formally denies a claim.

A. If a Third Party Administers an Insurance Policy for the Insurer, It Acts as an Agent and Its Conduct Is Attributable to the Insurer.

It is clear some of the dilatory conduct involved in processing McCormick's claim can be attributed to Sentinel and some of it can be attributed to the credit union. This conduct, taken together, resulted in nearly one year of delays in processing McCormick's claim for benefits. Ultimately it resulted in the repossession of McCormick's truck and camper. We consider whether as between McCormick and Sentinel, the credit union's conduct can be attributed to Sentinel for purposes of the bad faith cause of action.

In *Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 505 [63 Cal.Rptr. 35, 432 P.2d 731], our high court considered whether the acts of an employer who administered a group health insurance policy could be attributed to the defendant insurer. After reviewing conflicting cases from other jurisdictions, the court concluded the employer was acting as the insurer's agent and hence the insurer was liable for the employer's conduct. (*Id.,* at p. 508, citing Rest. 2d Agency, §§ 165, 282(2), and pp. 512-513.) In rejecting the view the employer acted as the employee's agent, the court cited the employer's assumption of the insurer's administrative functions and the employee's lack of control over the employer's actions in handling the policy. (*Id.,* at pp. 513-514; accord *Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 883 [103 Cal.Rptr. 865, 500 P.2d 889]; *Pantzalas* v. *Superior Court* (1969) 272 Cal.App.2d 499, 504 [77 Cal.Rptr. 354].)

Here, the credit union, like the employer in *Elfstrom,* performed administrative duties in connection with processing claims under Sentinel's dis-

---

[8]This issue raises an additional question of the credit union's liability to Sentinel in the event of an adverse judgment. However, Sentinel's right to indemnification is beyond the scope of this appeal.

ability policy. It is undisputed the credit union assumed such responsibilities as mailing the initial claim form to McCormick, notifying Sentinel of a possible claim from McCormick, and apprising McCormick his claim was incomplete. It also appears likely McCormick had no control over the credit union's actions. Under these circumstances a triable issue exists as to whether the credit union was acting as Sentinel's agent. If the fact finder determines an agency relationship, as defined in *Elfstrom,* did exist, the credit union's acts can be attributed to Sentinel.

B. The Insurer's Breach of the Duty of Good Faith Is Not Excused by the Insured's Failure to Comply With Minor Policy Provisions.

McCormick, citing *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141], cert. den. and app. dism. 445 U.S. 912 [63 L.Ed.2d 597, 100 S.Ct. 1271], argues Sentinel's failure to conduct an independent investigation of his claim for insurance benefits establishes it acted in bad faith.[9] Sentinel does not address the issue of whether an insurer has an affirmative obligation to investigate. Instead, citing *Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1 [148 Cal.Rptr. 653], disapproved on other grounds in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 824, footnote 7, and *Blake* v. *Aetna Life Ins. Co.* (1979) 99 Cal.App.3d 901 [160 Cal.Rptr. 528], Sentinel argues an insurer in a first party insurance case, as distinguished from a third party insurance case, owes its primary duty to its shareholders rather than its insured. According to Sentinel its actions with respect to McCormick's policy were in good faith as a matter of law because this duty to its shareholders prevented it from honoring a claim for benefits before it received a claim form which contained all requested information.

Before analysing the two court of appeal cases cited by Sentinel we emphasize in a case decided before either of them, our high court had already unequivocally rejected any distinction between the duties owed by first and third party insurers. (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566 [108 Cal.Rptr. 480, 510 P.2d 1032].) ▮ The court in *Gruenberg* reiterated its prior holdings that the duty imposed on an insurer in a third party case is the " 'duty to accept reasonable settlements.' " (*Id.,* at p. 573.) The court then described the duty imposed on a first party insurer as "a duty not to

---

[9]Sentinel distinguishes *Egan* on the ground it involved the duty of a third party insurer. However, in *Egan* the plaintiff sued on the basis of the insurer's failure to pay him benefits due from a disability insurance policy.

A third party insurance case involves a contention the insurer failed to settle a third party's claim against the insured within the policy limits. A first party case, on the other hand, involves a contention the insurer failed to pay benefits directly to the insured. Thus both *Egan* and the instant case involve the duty of a first party insurer and Sentinel's assertions to the contrary appear not well taken.

withhold unreasonably payments due under a policy." (*Ibid.*) The court then held the duty imposed in either case is "merely two different aspects of the same duty." (*Ibid.*)

*Gruenberg* thus stands for the proposition the standard of good faith and fair dealing imposed on an insurer in either a first party or third party case is one of *reasonableness.* The differences in the duty imposed on the insurer relate to the obligations it assumed under the contract with the insured and not any greater obligation to shareholders in a first party case.

Despite our high court's holding in *Gruenberg,* the Court of Appeal in *Austero* v. *National Cas. Co., supra,* 84 Cal.App.3d 1, distinguished the duty imposed on a first party insurer from the duty imposed on a third party insurer, in part on the basis of a presumed independent duty which a first party insurer owes to its shareholders. Both *Austero* and *Blake* v. *Aetna Life Ins. Co., supra,* 99 Cal.App.3d 901, rendered by the same appellate court, contain language which suggests a first party insurer's duty of good faith to its insured may be balanced against an independent duty to its stockholders. For example, in *Austero,* the court stated: "[A]n insurer [in a first party case] is not required to pay every claim presented to it. Besides the duty to deal fairly with the insured, the insurer also has a duty to its other policyholders and to the stockholders . . . not to dissipate its reserves through the payment of meritless claims." (84 Cal.App.3d 1, 30.) And in *Blake* the court, citing its *Austero* decision, supported its conclusion Aetna Insurance Company had not acted in bad faith with the statement: "Aetna thereby satisfied both its obligation to the plaintiff to act fairly and in good faith and its obligation to other policy holders and to stockholders not to dissipate its reserves through the payment of meritless claims." (99 Cal.App.3d 901, 924.)

■ These statements in *Blake* and *Austero,* imply there is a corollary to the duty of good faith which an insurer owes to its insured which also applies to the insurer's stockholders. However our research reveals this theory has not been followed by other California courts and we are likewise unpersuaded it has any merit.

Our conclusion is supported by our high court's decision in *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, 820-821. There, the court, in the context of justifying punitive damages for a bad faith breach by an insurer, described the special relationship between an insurer and its insured as follows: " 'Suppliers of services affected with a public interest must take the public's interest seriously, where necessary *placing it before their interest in maximizing gains and limiting disbursements* . . . [A]s a supplier of a public service rather than a manufactured product, the obligations of

insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary.'" (Citations omitted; italics added.)

*Austero* and *Blake* are clearly inconsistent with the policy concerns expressed in *Egan*. Obviously the duty of good faith and fair dealing does not require an insurer to honor "every claim presented to it." (*Austero, supra,* 84 Cal.App.3d at p. 30.) Nor does it require an insurer to pay "meritless claims." (*Blake, supra,* 99 Cal.App.3d at p. 924.) However, *Egan* makes it clear the duty does require an insurer to place the interests of its insured above its own or its stockholders' "interest[s] in maximizing gains and limiting disbursements." (24 Cal.3d 809, 820-821.)

We accordingly reject any implication in *Austero* or *Blake* there is an equivalent duty, either in a first party or third party case, owed to an insurer's stockholders which may be balanced against the duty owed to its insured[10] Rather, an insurer's conduct is judged based on whether, given the circumstances, the insurer unreasonably withheld benefits due under a policy. That conduct is unreasonable if inconsistent with placing the insured's interests above those of the insurance company and its stockholders. We thus consider if a factual issue exists concerning whether Sentinel's failure to pay benefits here was reasonable in light of McCormick's doctor's failure to fully complete his portion of the claim form.

*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, involved the plaintiff's entitlement to benefits under a fire insurance policy. The insurer had demanded Gruenberg comply with a policy provision requiring a statement under oath concerning the cause of any fire. When, on advice of counsel, Gruenberg requested his statement be delayed until resolution of criminal arson charges, the insurer denied the request and refused to pay benefits.

---

[10]We also emphasize the facts of *Austero* and *Blake* are distinguishable from the case before us. The court in *Austero* affirmed the portion of a jury verdict awarding disability benefits but reversed the portion of the verdicts awarding damages for insurance bad faith. Two factors were critical to the latter determination. First, the insured completed a claim form in which he asserted he was engaged in full time employment, was not under medical care and was in good health. Thus the insured's own statements directly refuted any claim he was entitled to disability benefits. Second, when the insured submitted a revised claim for benefits the policy had lapsed prior to the date he asserted he became totally disabled. Although it was later determined he was totally disabled while the policy was in effect, all the information submitted to the insurer indicated coverage had lapsed before the insured's disability. The insured's conduct in *Austero* contrasts sharply with McCormick's conduct here. McCormick, from the moment he was injured, has asserted he was disabled and unable to work. Moreover the information available to Sentinel regarding McCormick's claim suggests a legitimate claim. It does not refute the claim as did the information submitted by the insured in *Austero*. (*Blake* is distinguished in pt. II D of this opinion.)

The insurer defended against Gruenberg's bad faith action by citing the insured's failure to comply with an express provision of the policy. This defense was rejected by our high court: "All parties appear to assume that plaintiff's contractual duty is a dependent condition (whether precedent or subsequent) to defendants' covenant of good faith and fair dealing. . . . [¶] . . .

■ ". . . [However,] even though the duty allegedly assumed by defendant insurers arises from an existing contractual relationship, this duty is independent of the performance of plaintiff's contractual obligations.

"We conclude, therefore, that the duty of good faith and fair dealing on the part of defendant insurance companies is an absolute one. At the same time, we do not say that the parties cannot define, by the terms of the contract, their respective obligations and duties. We say merely that no matter how those duties are stated, the nonperformance by one party of its contractual duties cannot excuse a breach of the duty of good faith and fair dealing by the other party while the contract between them is in effect and not rescinded." (*Id.,* at pp. 577-578; see also Barry, *An Independent Duty of Good Faith and Fair Dealing in Insurance Contracts* (1974) 11 San Diego L.Rev. 492, 499-500.)

Thus, in *Gruenberg* our high court expressly rejected an argument the insurer's duty of good faith was excused by *the insured's failure to fulfill a policy condition.* Instead, the court held the insurer's duty of good faith is independent of the insured's performance of such contractual obligations. ■ ■■ ■ (*Id.,* 9 Cal.3d at pp. 573-574.)[11]

■ Admittedly the instant case presents a situation different from that which was before the court in *Gruenberg.* In *Gruenberg* the insured was placed in an impossible position. If he complied with the contractual provision he faced the possibility any statements could be used against him in a criminal arson proceeding. But if he failed to comply he would forfeit his rights to receive benefits under the insurance policy.

Here, McCormick did not face such a dilemma. Presumably he could have made sure his doctor filled in all requested data without suffering any ad-

---

[11]In *Gruenberg,* our high court also stated: "[The insurer's duty] is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." (*Id.,* at pp. 573-574, italics in original.)

verse consequences. However, even if the omitted data was necessary to Sentinel's decision concerning McCormick's entitlement to benefits, the insured's failure to supply this information did not absolve the insurance company of its duty to continue to deal in good faith. (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 573-574.)

Sentinel was aware McCormick was on a disability leave from work on June 28, 1977. Sentinel's records indicate between that date and October 28, 1977, it received eight communications from the credit union concerning McCormick's disability claim. By early January 1978, Sentinel had received McCormick's claim form which included the doctor's statement McCormick was totally disabled and unable to work at least between April 6, 1977, and November 25, 1977. The form also included a statement from McCormick's employer indicating on December 28, 1977, McCormick remained unable to work and McCormick's industrial injury was caused by his being pulled into a lathe. Despite all of this information which Sentinel did have,[12] and knowing McCormick had not worked for over 10 months, Sentinel returned McCormick's claim form to the credit union explaining the sole reason for this action was the doctor's failure to apprise Sentinel of the dates of medical treatment.

We believe whether the dates requested were essential to Sentinel's determination McCormick was disabled according to the terms of the policy presents a triable issue. The only information requested by Sentinel were dates of medical treatment. The information which Sentinel did have at its disposal included the nature of the industrial injury, the doctor's certification of a seven-month total disability, and the employer's statement McCormick was unable to work for at least eight months. This other information on the form supplied by the doctor and McCormick's employer may have been sufficient to at least apprise Sentinel McCormick was presenting a legitimate claim. And in light of the long delay in processing the claim a jury might well conclude it was bad faith to fail to pay or investigate further while awaiting completion of the missing section on the doctor's portion of the form.[13] (See also Murphy, *The Emerging Fiduciary Obligations and*

---

[12]The record indicates Sentinel was aware of all this information but it is not conclusive on the issue. However, if at trial McCormick proves the credit union was acting as Sentinel's agent then the credit union's acts and knowledge can be attributed to Sentinel. (See pt. III A of this opinion.) In that event whether Sentinel itself possessed this information would be immaterial. Sentinel will be chargeable with everything the credit union knew.

We also note Cupip, Inc. processed some of the paperwork related to McCormick's disability claim. Sentinel admits the agency relationship between itself and Cupip so naturally Cupip's acts and knowledge are attributable to Sentinel.

[13]Another factual issue presented is whether the policy even contained a condition requiring the submission of a doctor's statement in order to obtain the initial payment under the policy. McCormick's declarant, John Murphy, argued the policy contained no such condition. We find it unnecessary to resolve this issue.

*Strict Liability in Insurance Law* (1978) 14 Cal. Western L.Rev. 358 [arguing even these requirements of showing bad faith are too stringent].)

We do not suggest the conduct of the insured can be ignored. In most instances the conditions of insurance require an insured to submit proof of loss. The insurer relies on this information in its evaluation of the claim. But where, as here, the insured may have *substantially* complied with those conditions of insurance we believe a summary judgment order is improper.

An insurance company has a duty to pay a claim when it has acquired, through one means or another, sufficient evidence to establish the validity of that claim. It does not have the right to insist the claim be proved only through certain types of evidence. Nor does it exhibit good faith in denying a claim merely because an insured failed to dot the i's or cross the t's on a claim form or other submission. The issue is not whether the insurance company has received every item of information it requested from an insured. The question is not even whether the insurance company appears to have in its hands the exact type of information it prefers when deciding on a claim. Rather the real question is whether there was enough evidence of whatever form and however acquired that it would be unreasonable for the insurance company to refuse to pay the claim. We hold there exists a triable issue as to this last question and thus the trial court erred in granting summary judgment.

C. The Insurer's Duty to Process Claims Reasonably Includes an Obligation to Conduct at Least a Limited Investigation Into the Validity of a Claim Before Refusing to Pay That Claim.

We next consider whether the insurer's duty to process claims reasonably includes an obligation to conduct an independent investigation of a claim for benefits at least in some situations. If it does, a jury could conclude it was unreasonable for Sentinel to return the claim form instead of conducting such an investigation.

We note at the outset an insurer may breach the duty of good faith without acting maliciously or immorally. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 921, fn. 5 [148 Cal.Rptr. 389, 582 P.2d 980].)[14]

---

[14]In *Neal* our high court stated: "The terms 'good faith' and 'bad faith,' . . . are not meant to connote the absence or presence of positive misconduct of a malicious or immoral nature—considerations which, as we shall indicate below, are more properly concerned in the determination of liability for punitive damages. Here we deal only with the question of breach of the implied covenant and the resultant liability for compensatory damages. As stated by the draftsmen of the Restatement of Contracts, '[t]he phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat in the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose

Such a breach may occur merely by *unreasonably* denying a claim for benefits.

In *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809, at page 819, our high court made clear the standard of reasonableness may require an insurer to conduct an independent investigation of a claim. The court explained: "The insured in a contract [for disability insurance] does not seek to obtain a commercial advantage by purchasing the policy—rather, he seeks protection against calamity. As insurers are well aware, the major motivation for obtaining disability insurance is to provide funds during periods when the ordinary source of the insured's income—his earnings—has stopped. The purchase of such insurance provides peace of mind and security in the event the insured is unable to work. To protect these interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim. Although we recognize that distinguishing fraudulent from legitimate claims may occasionally be difficult for insurers, especially in the context of disability policies, an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." (Citation omitted.)

The holding in *Egan* was based on the insurer's "failure to have plaintiff examined by a doctor of their choice or to consult with plaintiff's treating physicians and surgeon . . ." before denying coverage. (*Id.,* at p. 817.) The court concluded "an insurer may breach the covenant of good faith and fair dealing when it fails to properly investigate its insured's claim." (*Ibid.*; see also *Moore* v. *American United Life Ins. Co.* (1984) 150 Cal.App.3d 610 [197 Cal.Rptr. 878] [characterizing insurer's failure to investigate the work experience of an insured before denying disability payments as one factor indicating unfair claims practices].)[15]

Here, Sentinel likewise failed to investigate the claim by consulting with McCormick's treating physician. Although presumably one phone call

---

and consistency with the justified expectations of the other party; it excludes [from consideration] a variety of types of conduct characterized [in other contexts] as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.' (Rest.2d Contracts (Tent. Draft Nos. 1-7) § 231.com. a.)" (21 Cal.3d 910, 921, fn. 5, some citations omitted; italics deleted.)

[15]We also note Sentinel may have violated Insurance Code section 790.03. Subdivision (h)(3) of that section includes an insurer's failure "to adopt and implement *reasonable standards for the prompt investigation* and processing of claims . . ." as an unfair insurance practice. (Italics ours; see also subds. (h)(2), (4), (5), and (13), relating to delays, communication failures, and failure to resolve a claim within a reasonable time; *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 891 [153 Cal.Rptr. 842, 592 P.2d 329].)

to the doctor could have supplied the omitted information Sentinel offers no explanation for why it did not adopt this course of action.[16]

We emphasize the insurance policy in the case before us consisted of a disability policy securing a loan which itself was secured by the insured's personal property. Prompt investigation and resolution of a claim for benefits under this type of policy appears to us particularly appropriate. This is not like most insurance where the insurer must decide whether to pay the entire policy amount in one lump sum. Instead it only need advance a small percentage each month. Thus the insurer's only exposure from making a decision to pay which turns out to be erroneous is the loss of a month or perhaps a few months' worth of monthly payments on the insured's personal property. Meanwhile the insured has a great deal more to lose from a long delay in honoring his claim. If the insurer fails to meet the monthly payment, the insured may lose possession of the personal property securing the loan. Such loss of possession may occur even after the insured has made thousands of dollars in payments or indeed has nearly paid off the loan. Under these circumstances the duty of good faith may entail an even more prompt effort by the insurer than would be required in other types of insurance cases.

Here, Sentinel failed to conduct any investigation whatsoever. As a consequence of this failure McCormick was exposed to the very risk which he purchased insurance to avoid. He lost his truck and camper because he was disabled and unable to meet the monthly payments. Coming at a time so close to an industrial accident which left McCormick unable to work, the consequence seems especially severe. Therefore we believe a triable issue also exists as to whether, in light of the omitted data, Sentinel's failure to investigate the validity of the claim was a reasonable claims practice.

D. A Finding of Bad Faith Is Not Negated Simply Because the Insurer Never Formally Denies Benefits.

 Sentinel, relying on *Blake* v. *Aetna Life Ins. Co., supra,* 99 Cal.App.3d 901, 919, 922, next argues the holding in *Egan* v. *Mutual of*

---

[16]In a supplemental brief submitted to this court, Sentinel argues the California constitutional right of privacy (Cal. Const., art. I, § 1) and the physician-patient privilege (Evid. Code, §§ 992, 994, 995) precluded it from contacting McCormick's doctor directly. We reject this argument. Sentinel admits it was provided with an authorization from McCormick to release medical records from Dr. Schiffman, the physician who completed McCormick's claim form. Sentinel's only complaint is the release "does little good where . . . only one treating physician is identified" because the release did not permit Sentinel to contact McCormick's other treating physicians. The fact remains, and Sentinel admits, it was authorized to contact Dr. Schiffman. Sentinel's February 3, 1978, letter indicated the only information needed by Sentinel was the dates of medical treatment from Dr. Schiffman. Had Sentinel investigated and received the dates and later determined it needed more information from other doctors it could have requested McCormick execute another authorization consenting to release of privileged information from those other doctors.

*Omaha Ins. Co., supra,* 24 Cal.3d 809, 819,—that "an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial"—only applies where an insurance claim has been formally denied. According to Sentinel, since McCormick's claim "remains open," Sentinel's conduct is in good faith as a matter of law. Although we find little merit in this argument, we will briefly explain our reasons for rejecting it.

In *Blake* v. *Aetna Ins. Co., supra,* 99 Cal.App.3d 901, relied on by Sentinel, the insured argued that although the insurer never formally denied her claim it was liable in bad faith for what she claimed was an incomplete and dilatory investigation. (*Id.,* at p. 919.) In her brief, the plaintiff advanced the following argument: " 'Delay, should, and must be tantamount to denial at some point in time, and delay in providing benefits may be subject to a finding of bad faith . . . just as well as an improperly denied claim.' " (*Ibid.*)

In rejecting the insured's argument the Court of Appeal distinguished Aetna's conduct from conduct of other insurance companies which had been found by other California courts to be liable for insurance bad faith: "In assessing the reasonableness of Aetna's conduct, it is necessary to keep in mind that Aetna never denied the claim, but persisted in seeking information essential to a determination of its merits. This is not an instance where the insurer withheld or threatened to withhold payments unreasonably for the purpose of injuring the insured by depriving him of the benefits of the policy. (Cf. *Fletcher* v. *Western National Life Ins. Co.,* 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].) Nor are the facts here similar to those in *Gruenberg* v. *Aetna Ins. Co.,* 9 Cal.3d 566, 574 [108 Cal.Rptr. 480, 510 P.2d 1032], where the insurer encouraged criminal charges by falsely implying a motive to commit arson and then used the insured's failure to appear at an examination during the pendency of the criminal charges as a pretense for denying liability. Nor are these facts similar to those in *Silberg* v. *California Life Ins. Co.,* 11 Cal.3d 452, 460 [113 Cal.Rptr. 711, 521 P.2d 1103], where, during the pendency of a worker's compensation proceeding, the insurer refused to advance payments under a policy intended to protect against medical bills, despite the fact that the insured lacked funds for necessary hospitalization. Instead, the facts here reveal that Aetna, although having been provided with no proof of accidental death by plaintiff, continued to investigate the claim even up to the time the complaint was filed. The evidence clearly indicates that in pursuit of this investigation Aetna made numerous attempts to obtain information and cooperation from plaintiff and plaintiff's attorney, all to no avail." (*Blake* v. *Aetna Life Ins. Co., supra,* 99 Cal.App.3d 901, 922.)

Thus, despite Sentinel's assertions to the contrary, the court in *Blake* did not hold a finding of bad faith is precluded where an insurer delays paying benefits rather than formally denying them. Rather the court merely held the insurer's delay was reasonable under the specific facts of that case. The court in *Blake* specifically found delay in that situation did not unreasonably deprive the insured of the benefits of the policy. Moreover, the delay was necessary in order to adequately investigate the claim.[17]

■■■ We already have enumerated the considerations involved in imposing liability on an insurer for unreasonably and in bad faith denying coverage under a policy. These considerations recognize the quasi-public nature of the insurance industry, the quasi-fiduciary relationship between insurer and insured, and significantly, the purpose of purchasing insurance—ensuring that the insured will be protected against losses incident to a disability or other catastrophe. "These considerations are particularly cogent in disability insurance. The very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity." (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 404 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

■■■ As we also explained earlier, as a consequence of Sentinel's delay in processing McCormick's claim the insured was exposed to the very risk which he purchased insurance to guard against. He purchased insurance so that the monthly payments on his truck would be paid by Sentinel if he was unable to make the payments himself because of a disability that kept him from working. As a result of *delay* in processing the claim, no payments were made and McCormick's truck and camper were indeed repossessed.

In view of the consequences McCormick has already suffered, we are unpersuaded by Sentinel's contention the bad faith claim is negated simply because benefits were never *formally* denied. In this case, and indeed we suspect in many cases, a lengthy delay in resolving a claim for insurance benefits will have the identical consequence for the insured as an outright denial of benefits. An insurance company cannot insulate itself from liability simply because rather than denying benefits outright it keeps a claims file on the shelf for months or years without ever formally denying it.

In a recent case this court held the eventual payment of medical expenses does not bar recovery for insurance bad faith. (*Harvey* v. *General Tire &*

---

[17]The insurance policy in *Blake* provided for accidental death benefits. The coroner's report indicated the insured had probably ingested a lethal dose of barbiturates and other evidence also suggested the death may have been a suicide.

*Rubber Co., ante,* pp. 1015, 1028-1029 [— Cal.Rptr. —] citing *Schlauch* v. *Hartford Accident & Indemnity Co.* (1983) 146 Cal.App.3d 926 [194 Cal.Rptr. 658].) Following the lead of the Court of Appeal in *Schlauch,* we held an "ultimate tender of benefits . . . does not defeat [a cause] of action for insurance bad faith or emotional distress. Rather, it merely mitigates damages." (*Ibid.*) If eventual *payment* of benefits due under a policy will not cure an earlier bad faith breach, a fortiori, the mere fact the insurer never formally denies coverage will not cure such a breach.

III. THE ORDER DENYING POST ARBITRATION DISCOVERY WAS NOT AN ABUSE OF DISCRETION.

McCormick's final argument relates to the order denying his motion for additional discovery. After this case was arbitrated McCormick sought answers to 19 interrogatories and 19 requests for admissions. Sentinel refused to provide the answers and McCormick brought a motion to compel. Through this discovery device McCormick sought to establish the following: his claim was adjusted according to Sentinel's normal claims procedures; no claims adjusters were punished or criticized for the manner in which his claim was adjusted; the actions of the claims adjusters were ratified by Sentinel's managerial employees; Sentinel's corporate officers and directors were aware of the manner in which his claim was adjusted; Sentinel's agents had authority and discretion to process the claim; and Sentinel made no attempt to investigate his claim. McCormick also sought to determine where Sentinel's claims adjusters live and work. The trial court denied the motion on the basis of Code of Civil Procedure section 1141.24. That section provides: "In cases ordered to arbitration pursuant to Section 1141.16(a), [the compulsory arbitration statute] absent a stipulation to the contrary, no discovery shall be permissible after an arbitration award except by leave of court upon a showing of good cause."[18]

McCormick argues good cause can be found in the complexities of the case as well as the fact important witnesses reside out of state and cannot be compelled to testify at trial.[19]

We agree with the trial court's grounds for denying the motion. If the case is unduly complex now it was also complex prior to arbitration. Likewise, if important witnesses reside out of state they also resided out of state prior to arbitration. Whatever the standard of good cause may be under

---

[18]Our research reveals only one case, *McMillan* v. *Superior Court* (1983) 146 Cal.App.3d 1014 [194 Cal.Rptr. 670], has involved application of the postarbitration discovery statute. That decision has no relevance to the case before us.

[19]We note McCormick did depose at least one of Sentinel's adjusters after the arbitration with the consent of Sentinel.

section 1141.24 McCormick has not shown good cause for further discovery by arguing the case is complex or witnesses cannot be compelled to testify.

The trial court found McCormick had not identified any facts or circumstances which would constitute good cause[20] warranting additional discovery. Since the trial court had discretion to decide this issue our review is limited to an abuse of discretion standard. (*Allen* v. *Toledo* (1980) 109 Cal.App.3d 415, 422 [167 Cal.Rptr. 270].) We have found no such abuse and accordingly we reject this claim of error.

### DISPOSITION

The order granting the motion for summary judgment is reversed. The order denying additional discovery is affirmed. Sentinel's request for sanctions is denied and Sentinel is ordered to pay McCormick's costs on appeal.

Schauer, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied April 24, 1984, and the opinion was modified to read as printed above.

---

[20]One might have some concerns about the policy assumptions underlying section 1141.24. By insisting that both sides conduct all discovery prior to arbitration, the statute substantially increases the costs to litigants of resolving cases in arbitration. This undermines one of the major goals of compulsory arbitration—to provide litigants a less costly forum. Section 1141.24 also may increase the likelihood that parties will file requests for trial de novo since they already will have been compelled to make all their discovery investments, not infrequently the most expensive phase of litigating a lawsuit. These heavy "sunk costs," in turn, may encourage parties who are mildly dissatisfied with the outcome of an arbitration to take the case one step further even though they would not do so if they had not invested so heavily in the case already. Nonetheless, the statute exists and controls our review of the trial court's decision.