**Gregory John HOCK, Conservator for Ahmed Abdelsamed, Petitioner,**

v.

**NEW YORK LIFE INSURANCE COMPANY, Respondent.**

No. 93SC3.

Supreme Court of Colorado,
En Banc.

June 20, 1994.

Rehearing Denied Aug. 8, 1994.

---

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, for petitioner.

Wood, Ris & Hames, P.C. by Donald B. Gentry, Denver, for respondent.

Justice VOLLACK delivered the Opinion of the Court.

We granted certiorari to review the court of appeals decision in *Abdelsamed v. New York Life Insurance Co.*, 857 P.2d 421 (Colo. App.1992), which concluded that the trial court abused its discretion in several of its evidentiary rulings and remanded the case for retrial on the breach of contract claim and bad faith breach of insurance ·contract claim, as well as on New York Life Insurance Company's counterclaim for rescission. We hold that the trial court did not abuse its discretion. We therefore reverse the court of appeals and remand with directions to reinstate the trial court's judgment.

## I.

### A. *History of Illness*

The petitioner, Ahmed Abdelsamed (Abdelsamed), a self-employed engineering consultant, purchased disability insurance coverage on March 27, 1986, through the Institute of Electrical and Electronic Engineers which had a group disability policy with New York Life Insurance Company (NYL).[1] The application form, which Abdelsamed completed

---

1. The policy provided that, in the event Abdelsamed became totally physically or mentally disabled, NYL would pay monthly benefits of $3,080 beginning on the thirty-first day after a total disability occurred. The policy also provided, in somewhat ambiguous language, for a two-year

and submitted on December 12, 1985, required him to provide detailed information regarding his income and the existence of other outstanding insurance policies. Abdelsamed listed his gross annual income for 1985 as $392,000 and stated that he had no other disability insurance. However, in the preceding four months, he had applied for disability insurance from three other companies, and at the time of his application to NYL, he was insured by two of them under policies which would provide him with monthly disability benefits totalling $10,000.[2]

Abdelsamed claims that on December 19, 1985, several days after Abdelsamed mailed his application form to NYL, he confirmed in writing a telephone conversation he had had with an employee of NYL. In his letter, Abdelsamed expressed that he wanted to amend his application form to include two other disability policies: Mutual Benefit Life, Class 4–A, $4,000 to Age 65; and Monarch, Class 4–A, $6,000 Life. According to Abdelsamed's letter, NYL's employee had told Abdelsamed that his failure to include the other two policies on the application did not matter as long as the total coverage did not exceed sixty percent of his income.

On March 30, 1986, three days after the policy was issued, Abdelsamed, who was in Egypt working on an engineering contract with ACETO Engineers–Contractors, a private Egyptian company, was hospitalized in Cairo with a "major affective disorder, depressed type."[3] He remained in the psychiatric hospital until August 31, 1986. From September 1986 to January 30, 1987, Abdel-

samed was hospitalized for a second time and received psychiatric treatment at a different hospital in Cairo. Upon release, he began his return journey to the United States via Germany. He traveled to Munich, Germany, where he was again admitted to a psychiatric hospital after apparently suffering a psychotic episode during which he allegedly lost his important documents, including his passport, medical records, financial records, and confirmation of his compensation from ACETO.

Abdelsamed returned to the United States.[4] On March 19, 1987, less than one week after his arrival, El Paso County District Court Judge Donald E. Campbell committed Abdelsamed to the state hospital in Pueblo, Colorado, based on his determination that Abdelsamed was mentally ill, and a danger to himself and others.

After Abdelsamed was released from the state hospital seventeen days later, he lived in a community shelter for the homeless. Abdelsamed was subsequently deemed eligible for Social Security Disability benefits based upon his psychiatric disability. Since then, Abdelsamed has continued to receive psychiatric care and has not worked.

### B. *Disability Benefits Claim*

In April 1986, while undergoing his first psychiatric hospitalization in Egypt, Abdelsamed filed a claim for disability benefits with NYL. Since Abdelsamed's claim was filed within two years after the policy had become effective, NYL invoked the provision allowing it to undertake a contestability in-

contestability period during which NYL could investigate and rescind the policy if it determined that there were material misrepresentations within the application.

2. The court of appeals determined that the evidence conflicts as to whether Abdelsamed disclosed this information before he became covered under NYL's policy or whether NYL obtained knowledge of the policies subsequent to Abdelsamed's initiating his lawsuit.

3. At trial, Abdelsamed's treating psychiatrist, as well as Abdelsamed's expert psychiatrist on Middle Eastern psychiatric practices, testified that Abdelsamed has been mentally ill and perma-

nently disabled by reason of mental illness since March 30, 1986. They testified that his illness includes conditions consistent with schizoaffective disorder (a mixture of schizophrenia and depression), mood disorder (described as psychotic depression and bipolar depression), manic-depressive illness, and organic brain disease evidenced by brain shrinkage detected with both MRI and CAT scans.

4. The United States Consulate in Munich purchased an airline ticket to Colorado Springs for him.

vestigation and verify the statements made on the application rather than begin payments on the thirty-first day after Abdelsamed· had been hospitalized.

NYL hired investigators in Egypt to verify Abdelsamed's hospitalization and to verify his reported gross income of $392,000 in 1985. NYL requested from Abdelsamed his daily hospital records from the Egyptian hospitals and for authorization to obtain records from the Internal Revenue Service and Small Business Administration to verify his earnings.

NYL's investigators confirmed that Abdelsamed was hospitalized during the specified dates in two psychiatric hospitals in Cairo. Abdelsamed's treating doctors at both hospitals supplied NYL with discharge summaries detailing Abdelsamed's medical diagnosis and prognosis.

NYL informed Abdelsamed that the summary information was insufficient and that NYL would not consider his claim unless he provided NYL with daily hospital records from each hospital. Both hospitals failed to produce the detailed records.[5]

Abdelsamed subsequently provided NYL with a copy of the district court's order committing him involuntarily to the Colorado State Hospital, and also informed NYL that he had been under continuous psychiatric treatment since his return to the United States. NYL's investigator in Colorado Springs confirmed that Abdelsamed was under a psychiatrist's care, that the federal government had approved his receipt of Social Security Disability benefits, and that he had lived at a homeless shelter. Abdelsamed also provided NYL with official Internal Revenue Service summaries of his 1984 and 1985 tax returns, as well as several one-page hospital discharge summaries.

NYL contended that the documentation was insufficient, and in August 1987, NYL closed Abdelsamed's file pending the receipt of the requested information. Abdelsamed provided no further information, and NYL neither denied nor approved Abdelsamed's claim.

In November 1987, Abdelsamed filed suit in El Paso County District Court against NYL for failing to pay his disability benefits. He sought compensatory and punitive damages for breach of contract, bad faith breach of an insurance contract, and outrageous conduct. NYL counterclaimed for rescission of the contract, claiming that Abdelsamed had misrepresented material facts within his application, namely, his gross income for 1985 and the existence of other disability insurance coverage.

At trial, an analyst with the State of Colorado, Division of Insurance, testified as a non-expert witness that after reviewing Abdelsamed's 1985 tax return she believed his income for that year was $385,840. Furthermore, she testified that, based on her review of the medical records and upon a personal meeting with Abdelsamed, she believed that Abdelsamed was mentally ill. NYL made timely objections to the introduction of this evidence.

NYL's psychiatric expert, who performed a "psychometric" test for cognitive impairment on Abdelsamed prior to trial, testified that Abdelsamed was malingering and feigning mental illness. This expert had been sued in a previous civil matter (the *Anderson* case) on the basis that his test methods were unreliable.[6] In deference to the court in the *Anderson* case,·the district court in the present case ruled that NYL's psychiatric expert could be cross-examined as to whether he had been sued in *Anderson,* whether the case had been settled, and the nature of the claims against him in *Anderson.* The district court ruled that NYL's expert, however, could respond to any question by stating he

---

5. Abdelsamed's expert on Middle Eastern psychiatric practices testified that Egyptian mental hospitals do not keep daily hospital records because record-keeping in psychiatric institutions in the Middle East is hampered by lack of resources and illiterate mid-level employees.

6. The *Anderson* case settled, and the Boulder District Court issued a·protective order to keep all discovery confidential and to seal the record in the case.

was not permitted to answer the question because it would violate the *Anderson* court's protective order.

Abdelsamed offered additional evidence to verify his income: an official Internal Revenue Service summary of his tax returns; and year-end summaries, signed by Abdel Majid Salama, the chief executive officer of ACE-TO, of Abdelsamed's earned income.[7]

NYL also sought to introduce "other acts" evidence consisting of Abdelsamed's alleged misrepresentations in an application to another insurance company, Mutual Benefit Life Insurance Company (Mutual Benefit). According to NYL, Abdelsamed had informed Mutual Benefit that he did not intend to travel to foreign countries. NYL asserts that this representation was false and was made by Abdelsamed in order to secure insurance which Mutual Benefit might not otherwise have sold to him. NYL also sought to introduce evidence concerning Abdelsamed's claim for theft of computer equipment from the trunk of his car, a claim filed with Royal Globe Insurance Company (Royal Globe). According to NYL, Abdelsamed misrepresented the title to the computer equipment. Abdelsamed filed a motion *in limine* to exclude the "other acts" evidence and the district court granted his motion.

The jury returned a verdict in favor of Abdelsamed for $209,644 on his breach of contract claim, and for $915,933 on his bad faith breach of insurance contract claim. The jury found against NYL on its rescission counterclaim.

NYL appealed the judgment on several evidentiary grounds. NYL neglected, however, to designate into the record the district court's *in limine* ruling, including the district court's application of *People v. Spoto*, 795 P.2d 1314 (Colo.1990), to the "other acts" evidence.

The court of appeals reversed the judgment in favor of Abdelsamed. The court of appeals concluded that the trial court abused its discretion in several of its evidentiary rulings and remanded the case for a new trial on Abdelsamed's breach of contract claim and bad faith breach of insurance contract claim, as well as on NYL's counterclaim for rescission. The court of appeals determined that NYL should have been permitted to cross-examine Abdelsamed's medical expert on the "other acts" evidence. The court of appeals held that the district court did not apply the four-part test in *Spoto* when it excluded evidence of the "other acts" that, according to the court of appeals, may have established a motive for Abdelsamed to feign mental illness. The court of appeals also determined that the analyst from the Colorado Division of Insurance should not have been allowed to express an expert opinion; that ACETO documents summarizing Abdelsamed's income were inadmissible hearsay; and that NYL's psychiatric expert witness was subjected to improper cross-examination. Finally, the court of appeals ruled that the jury was improperly instructed on NYL's rescission counterclaim.

Abdelsamed then petitioned the court of appeals for a rehearing. He included within his petition the designated portion of the district court's ruling establishing that the district court had applied the *Spoto* test when it ruled on the "other acts" evidence. The court of appeals denied Abdelsamed's petition for rehearing.

We granted certiorari to review the court of appeals' refusal to consider the record of the district court's ruling on the "other acts" evidence; the court of appeals' vacating the verdict on the ground that several of the district court's evidentiary rulings were an abuse of discretion; and the court of appeals' conclusion that the jury instruction on the rescission counterclaim and special verdict form # 2 were erroneous.

We hold that the court of appeals erred in reviewing the rulings of the trial judge. We

---

7. The written year-end summaries for 1984 and 1985 were taken from a preservation deposition of Salama in which he was subjected to cross-examination by NYL counsel. Various exhibits were also introduced at the deposition, including progress payment receipts from Salama for contract work performed by Abdelsamed.

further find that, even if the district court erred in any of the evidentiary rules at issue, the error was harmless since it did not affect the outcome of the trial. Because we find no abuse of discretion by the district court, we reverse the court of appeals.

## II.

### A. *Colorado Rule of Evidence 404(b)*

We first address NYL's attempt to introduce "other acts" evidence under CRE 404(b). NYL sought to introduce evidence that, in order to secure insurance that might not otherwise have been sold to him, Abdelsamed had informed Mutual Benefit that he did not intend to travel to foreign countries. NYL also sought to introduce evidence concerning a claim for theft of computer equipment that Abdelsamed filed with Royal Globe. According to NYL, Abdelsamed misrepresented that he owned the computer equipment. The district court excluded the evidence.

In the *in limine* hearing to exclude the "other acts" evidence, the district court applied the four-part *Spoto* analysis and ruled that the "other acts" evidence was inadmissible under CRE 404(b) and 403. The district court stated that NYL did not articulate a "precise evidenti[ary] hypothesis by which a material fact could be permissibly inferred" and that the admission of the "other acts" evidence would create "undue confusion" and "collateral issues." The district court additionally noted that the fact that Abdelsamed allegedly misstated his plans concerning for-

eign travel to Mutual Benefit is not logically relevant to a contention that Abdelsamed knowingly misrepresented his income or the existence of other insurance policies to NYL. Similarly, the district court concluded that Abdelsamed's statement concerning the ownership of the computer equipment that was the basis for a claim filed with Royal Globe is irrelevant to his state of mind when he applied for medical and disability coverage from NYL.

The court of appeals held that the district court erred in excluding the "other acts" evidence under CRE 404(b) because the evidence was admissible to show a plan to defraud NYL. The court of appeals maintained that the fact that Abdelsamed had allegedly made misrepresentations in other disability applications, and that he had filed an allegedly false theft claim, supported the defendant's theory that Abdelsamed had a plan to defraud his insurers. The court of appeals concluded that "the issue of the plaintiff's malingering was central to the defendant's case, and proof of a plan to defraud was an important element in establishing a motive for feigning mental illness."[8] *Abdelsamed v. New York Life*, 857 P.2d at 425. The court of appeals also said that, without the "other acts" evidence, NYL was unable to effectively cross-examine Abdelsamed's medical expert on Middle Eastern psychiatric hospitals about whether his medical opinion would be affected by knowledge that Abdelsamed had submitted a false theft claim or that Abdelsamed had made misrepresentations on other insurance applications.[9]

NYL now argues that the "other acts" evidence is logically relevant to demonstrate

---

8. One of NYL's medical expert witnesses described "malingering" as the conscious, intentional production or exaggeration of symptoms in pursuit of a readily identifiable goal.

9. Based on a review of the medical records which identified Abdelsamed's clinical examination and treatment, one of Abdelsamed's medical experts concluded that Abdelsamed is severely disabled by reason of mental illness. The expert, when asked his opinion as to whether Abdelsamed was feigning mental illness, replied: "If you told me he had been arrested a number of times or he had had bogus claims for one thing or another, I would say that might put [Abdelsamed] more in this direction." Abdelsamed's

medical expert refined his answer, however, by stating:

> I don't think he's malingering because his behavior is self-defeating, which is not common in malingerers.... [I]f his goal were to fake [mental illness] in order to get an insurance payment, ... [he would] cooperate with the people who were trying to get him to achieve his goal, and he's grossly uncooperative. .
>
> ... [S]omeone who is ... going to go on faking being mentally ill for four solid ... years is going to be good enough to give you the same story each time. So why [Abdelsamed] would go from doctor to doctor with a

that Abdelsamed had a plan to defraud NYL by exaggerating his income and by concealing the existence of insurance coverage under other insurance policies when he applied for insurance coverage from NYL.[10] NYL further contends that this evidence is admissible under *Spoto* to show a general plan as well as to show motive for feigning mental illness. NYL also maintains that the evidence is admissible for impeachment purposes.

CRE 404(b) prohibits the introduction of evidence to prove that a person acted in conformity with a character trait. CRE 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ This court developed a four-part test in *People v. Spoto,* 795 P.2d 1314 (Colo.1990), to determine the admissibility of "other acts" evidence in a criminal action. We later adopted the *Spoto* analysis in evaluating whether CRE 404(b) excludes "other acts" evidence in a civil action. *Boettcher & Co. v. Munson,* 854 P.2d 199, 210 (Colo.1993). Under *Spoto,* such evidence is admissible only if (1) the evidence relates to a material fact; (2) the evidence has logical relevance in that the evidence adds to the probability that the material fact is true; (3) the logical relevance of the evidence does not depend on an inter-

mediate inference that the litigant has a bad character, which would be employed to support a further inference that the litigant acted in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the evidence's prejudicial impact.

■ Where "other acts" are admitted to show a common plan, scheme, or design, the evidence is admissible where it involves a similar transaction. *People v. Moen,* 186 Colo. 196, 200, 526 P.2d 654, 656 (1974); *People v. Peterson,* 633 P.2d 1088, 1090 (Colo. App.1981) ("evidence is not admissible which shows or tends to show that the accused has committed a crime wholly independent of [the] offense for which he is on trial"). The Tenth Circuit has observed that "[t]here must be a clear and logical connection between the alleged earlier offense or misconduct and the case being tried." *United States v. Biswell,* 700 F.2d 1310, 1317–18 (10th Cir.1983).

■ In addressing the court of appeals' holding that "Abdelsamed's misrepresentations made on other disability insurance applications could lend support to the defendant's theory that Abdelsamed had a plan to defraud his insurers," we recognize that the conduct at issue in the trial must be part of a single scheme of which the earlier wrongful acts are evidence. The allegations of fraudulent misstatements made on the application form to Mutual Benefit and the claim form to Royal Globe do not suggest an intent or plan by Abdelsamed to fraudulently obtain disability benefits from NYL by exaggerating his

completely different presentation would not make much sense.

The district court excluded the "other acts" evidence against Royal Globe and Mutual Benefit. The district court informed NYL's counsel, however, that he could cross-examine Abdelsamed's medical expert about any alleged misrepresentations made by Abdelsamed to NYL and how the expert's diagnosis would be affected by evidence of Abdelsamed's alleged fraud against NYL.

NYL asserts that the "other acts" evidence should have been admissible in cross-examining Abdelsamed's medical expert for the following reasons: Abdelsamed's expert witness opened

the door on direct; Abdelsamed's malingering was a central issue in this case; and the expert's testimony put Abdelsamed's character in issue.

10. NYL additionally maintains that the proffered evidence provides proof of Abdelsamed's plan to gain benefits from three different insurance companies by feigning mental illness. According to NYL, the misrepresentations on the other applications, combined with the misrepresentations contained in Abdelsamed's application to NYL, establish a continuous scheme or plan to defraud.

income or concealing his other insurance coverage.[11] These prior insurance transactions involved different insurers with different requirements for disclosure on the applications. Further, at the time of trial, no fact-finder had determined that either the application form to Mutual Benefit or the theft claim form to Royal Globe contained fraudulent statements.

[4] A reviewing court can conclude that the trial court abused its discretion only if the trial court's ruling is manifestly arbitrary, unreasonable, or unfair. *People v. Ibarra*, 849 P.2d 33, 38 (Colo.1993).

We hold that the district court appropriately exercised its discretion and properly applied the *Spoto* standard in ruling that the "other acts" evidence was inadmissible. The district court's ruling was neither manifestly arbitrary nor was it unreasonable.

### B. *Colorado Rule of Evidence 403*

The district court additionally excluded the "other acts" evidence under CRE 403 on the grounds that, even if such evidence were relevant, such an inquiry "would interject undue confusion and would create a collateral issue [to be tried]."

CRE 403 requires the exclusion of relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Evidence may also be excluded when its admission would mislead the jury, confuse the issues, or result in a waste of time or needless presentation of cumulative evidence.

As the Seventh Circuit has noted in construing the federal counterpart to CRE 403:

The balancing of probative value and prejudicial effect, like other comparisons of intangibles, requires an exercise of judgment rather than a computation. Only in an extreme case are appellate judges competent to secondguess the judgment of the person on the spot, the trial judge.

*United States v. Krenzelok*, 874 F.2d 480, 482 (7th Cir.1989).

■ In reviewing a district court's evidentiary ruling on the probative value and the prejudicial impact of the evidence, a trial court is afforded considerable discretion in passing on the admissibility of evidence, and its determination will not be disturbed on review absent a showing of an abuse of discretion. *People v. District Court*, 869 P.2d 1281, 1285 (Colo.1994); *Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1107 (Colo.App. 1990); *People in the Interest of R.G.*, 630 P.2d 89, 93 (Colo.App.1981).

■ Applying the above standards to this case, we conclude that the district court did not abuse its discretion in deciding that the admission of alleged fraudulent misrepresentation claims involving different insurers would cause undue confusion of the issues, interject collateral issues of minimal probative value, and confuse the jury. The district court did not abuse its discretion by ruling that the "other acts" evidence created a substantial danger of unfair prejudice under CRE 403 since the repeated allegations of prior fraud could have unjustly influenced the jury to create an inference that Abdelsamed had a bad character. Further, to open the courtroom to a flood of collateral allegations would have necessitated a trial within a trial concerning Abdelsamed's alleged misrepresentations prior to, and independent of, the insurance policy at issue in this case. In effect, the admission of the "other acts" evidence would lead to trying two other insurers' claims of fraud—insurers who were not even parties to this case. Such a trial "would have consumed a great deal of trial time and would have had slight probative value." *Sims v. Mulcahy*, 902 F.2d 524, 531 (7th Cir.) (quoting *Jones v. Hamelman*, 869 F.2d 1023, 1027 (7th Cir.1989)), *cert. denied*, 498 U.S. 897, 111 S.Ct. 249, 112 L.Ed.2d 207 (1990).

### C. *In Limine Hearing*

The court of appeals found that the district court abused its discretion since it had not

---

11. In fact, the coverage provided by the other policies does not exceed the sixty percent income coverage limit used by NYL. Further, in its application form, NYL never asked any question addressed or designed to elicit a response about Abdelsamed's foreign travel or his theft claim.

provided adequate findings for excluding NYL's "other acts" evidence. The court of appeals reached this conclusion since Abdelsamed's counsel on appeal failed to provide the relevant fifty-page transcript of the district court's *in limine* hearing. The court of appeals noted that "NYL's principal argument is that it was denied a fair trial by the court's decisions concerning the admissibility of evidence relevant to NYL's theory that the plaintiff had a plan to defraud the company."

Abdelsamed contends that the reason the record on appeal was inadequate was because NYL failed to include the district court's *in limine* ruling and to provide the court of appeals with the district court's analysis on the issue. Abdelsamed maintains that the court of appeals consequently made improper evidentiary findings when it disregarded the district court's *Spoto* analysis and applied its own *Spoto* analysis. Further, according to Abdelsamed, when the transcript of the district court's evidentiary hearing was produced with the petition for rehearing, the court of appeals chose not to consider it.[12] Abdelsamed additionally maintains that the court of appeals accepted this "principal argument" largely by assuming that the district court did not make careful or detailed findings concerning Abdelsamed's motion *in limine*. Abdelsamed further contends that, by not having the transcript of the *in limine* hearing, the court of appeals erroneously stated: "The [district] court's only stated basis for refusing to admit the 'other acts' evidence was that it did not find these mat-

ters were 'an issue' in the trial. Based upon our review of the record, we conclude this was error." *Abdelsamed v. New York Life,* 857 P.2d at 425.

NYL asserts, to the contrary, that the court of appeals was able to effectively judge whether a rehearing was necessary in light of the fact that the complete record was before them. Further, NYL contends that a rehearing by the court of appeals would have served no useful purpose since NYL had been denied a fair trial thus necessitating remand for a new trial. Even if the trial court correctly applied *Spoto* in its *in limine* ruling, NYL argues that CRE 405(b)[13] formed another basis for admitting the same evidence.

 It is incumbent upon the moving party to designate all those portions of the record necessary for the appeal. *Till v. People,* 196 Colo. 126, 127, 581 P.2d 299, 300 (Colo.1978). An appellate court must presume that the trial court's findings and conclusions are supported by the evidence when the appellant has failed to provide a complete record. *People v. Morgan,* 199 Colo. 237, 242–43, 606 P.2d 1296, 1300 (Colo.1980). Furthermore, the moving party will not be permitted to take advantage of its own failure to designate pertinent portions of the transcript as part of the record on appeal. *See Till,* 196 Colo. at 127, 581 P.2d at 300.

 The district court held a lengthy hearing, questioned counsel about the rele-

---

12. NYL designated Abdelsamed's Motion *In Limine* to Exclude Evidence of Abdelsamed's Alleged Fraud and Other Insurance Transactions and NYL's response. NYL also designated the entire transcript of trial proceedings. The motion *in limine*, however, was argued and decided in pretrial proceedings on November 28, 1990, and NYL did not designate the record containing those proceedings. To redress this omission, Abdelsamed's trial counsel designated the transcript of the November 28, 1990, pretrial hearing. According to Abdelsamed's present counsel, the record transmitted by the district court, however, did not include the record of the *in limine* hearing, and Abdelsamed's former counsel apparently did not note its absence. El Paso County District Court Judge Donald E. Campbell appointed present counsel to represent Abdelsamed

on appeal before the petition for rehearing was due. Abdelsamed's present counsel filed a petition for rehearing, and supplemented the record with the transcript of the *in limine* hearing and the court's ruling which called to the court of appeals' attention the fact that the district court had heard extensive legal argument and applied the four-part test from *Spoto*. The court of appeals denied the petition for rehearing.

13. CRE 405(b) provides in relevant part:

**Specific instances of conduct.** . . . [I]n cases in which character or a trait of character of a person is an essential element of a charge, claim or defense, proof may also be made of specific instances of his conduct.

vance of the alleged misrepresentations to Mutual Benefit and Royal Globe, researched the appropriate legal standards, performed an extensive *Spoto* analysis, and issued a detailed ruling. The fifty-page transcript of the evidentiary hearing demonstrates that the district court analyzed the relevant factors for determining whether the "other acts" evidence should have been admitted under CRE 404(b).

We further find that the court of appeals invaded the district court's discretionary province when it denied Abdelsamed's petition for rehearing and substituted its own *Spoto* analysis. We therefore affirm the district court's ruling regarding the "other acts" evidence because a review of the record reveals that the district court did not abuse its discretion in its *in limine* ruling.

## III.

The court of appeals concluded that the district court erred when it: (1) admitted the testimony of an employee of the State of Colorado, Division of Insurance, concerning Abdelsamed's income and medical condition since she was not properly qualified as an expert; (2) admitted documents relating to Abdelsamed's income that lacked circumstantial guarantees of trustworthiness; and (3) allowed the cross-examination of NYL's medical expert to prove that he used unreliable testing methods in formulating his medical opinion as to Abdelsamed's mental health. The propriety of each evidentiary ruling will be discussed separately.

### A. *Evidentiary Ruling 1*

The court of appeals held that the district court improperly admitted opinion testimony of an employee of the Colorado Division of Insurance concerning Abdelsamed's income and medical health since she was not properly qualified as an expert.

The primary analyst for life, accident, and health insurance at the Division testified as a

non-expert witness that Abdelsamed disclosed taxable income in 1985 of $385,840 and that she believed that the income declared was the income earned. She arrived at this conclusion based on the financial documents provided by Abdelsamed to the Division of Insurance. She additionally testified that she had reviewed Abdelsamed's medical records and that in her judgment Abdelsamed was mentally ill. NYL made timely objections to the introduction of this evidence. We find that the state insurance analyst's opinion evidence was not erroneously admitted.

 A witness may testify in the form of an opinion if: (1) the opinion is based on the perception of the witness, and (2) it is helpful to a clear understanding of a fact at issue. *See* CRE 701. A trial court has broad latitude in determining whether a lay witness is qualified to testify as to any conclusions based on common knowledge or experience. *United States v. Mandujano,* 499 F.2d 370, 379 (5th Cir.1974), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

 The state insurance analyst's testimony stating that it was her opinion that Abdelsamed had not misrepresented his income is admissible. She arrived at her conclusion based on her review of Abdelsamed's 1984 and 1985 tax returns, an official Internal Revenue Service summary document describing Abdelsamed's reported income,[14] as well as her common tax knowledge and her experience as an insurance analyst.

 The opinion of the state insurance analyst concerning Abdelsamed's mental health is admissible because (1) it was based upon documentation she received as well as a personal meeting with Abdelsamed, and (2) Abdelsamed's mental health was a fact at issue. Her testimony regarding Abdelsamed's mental health was also supported by the testimony of the expert witnesses intro-

---

14. In giving her opinion, she reviewed an exhibit that was already before the jury and therefore

any comment on it was harmless.

duced at trial. An expert psychiatric witness and Abdelsamed's treating psychiatrist both testified that Abdelsamed was mentally ill; the facts are undisputed that the federal government approved Abdelsamed's application for permanent Social Security Disability payments based on its conclusion that Abdelsamed suffered from a serious mental illness and the fact that a state judge involuntarily committed Abdelsamed to a mental hospital.[15] Finally, the district court admonished the jury that the witness was "not testifying as a medical expert but simply from her area of employment in the insurance industry."

■ We find that the district court was within the bounds of its discretion when it permitted the state insurance analyst to testify whether she believed that Abdelsamed had misrepresented his income. Further, even if her non-expert testimony about Abdelsamed's mental illness constituted an inadmissible opinion by a non-expert, we agree with Abdelsamed's contention that it was cumulative of extensive testimony by other experts who testified for Abdelsamed and was also corrected by immediate limiting instructions. It was, therefore, harmless. Thus, the court of appeals erred in ruling that the state insurance analyst's testimony was inadmissible within this context.

### B. *Evidentiary Ruling 2*

The district court ruled that the written income summaries, prepared and signed by Abdel Majid Salama (Salama), the chief executive officer of ACETO, which outlined the amount of income Abdelsamed earned from ACETO were admissible hearsay pursuant to the residual exception in CRE 803(24) as having the circumstantial guarantees of

trustworthiness. Finding that the documents were self-authenticating because they bore a notary-type acknowledgment, the district court ruled that the documents were admissible under CRE 803(24).

The court of appeals concluded that the district court committed reversible error by admitting these documents since they lacked circumstantial guarantees of trustworthiness in light of the summary nature of the documents, the lack of corroborating evidence, the fact that they were executed several years after the payments were allegedly made, and the lack of testimony explaining their content or authenticating Salama or his company.

NYL states that the written year-end income statements signed by Salama were inadmissible under the residual exception to the hearsay rule since Salama's deposition standing alone cannot supply the circumstantial guarantees of trustworthiness. NYL maintains that, under the circumstances of this case, a finding of authenticity cannot be equated to a finding that the exhibits bore circumstantial guarantees of trustworthiness. NYL asserts that Salama's summaries of his business records could have been "prepared for this litigation."[16] NYL additionally maintains that the income statements—prepared three years after the fact and nine months after commencement of the litigation—are no more than affidavits of an unknown person from an unknown company without any back-up documents, and that there are no witnesses to explain the content, and no basis whatsoever to determine the reliability or trustworthiness of the documents. NYL insists that nothing short of ACETO's books and ledgers should be ad-

---

15. NYL impliedly conceded that Abdelsamed was mentally ill when it advised in a post-trial motion that Abdelsamed was not mentally competent to testify.

16. NYL asserts that "Abdelsamed had control over Salama. He produced only what he wanted to produce." NYL's allegation that Salama is "controlled" by Abdelsamed is unsupported by the record. Salama's deposition testimony indi-

cates that Salama had no motive to perjure himself in order to benefit Abdelsamed. In fact, Salama fired Abdelsamed in March 1986 before completion of his contract since Abdelsamed's performance was suffering due to his illness. Salama additionally testified that he was unaware of and not impacted by the lawsuit between NYL and Abdelsamed.

missible to prove Abdelsamed's employment by ACETO.[17]

CRE 803(24) provides for the admission of statements that are not specifically covered by any of the delineated hearsay exceptions if the court determines that: (1) the statements have "equivalent circumstantial guarantees of trustworthiness"; (2) the statements are "offered as evidence of a material fact"; (3) the statements are more probative than any other evidence that can be procured through reasonable efforts; (4) "the general purposes of [the] rules and the interests of justice will best be served by admission of the statement[s] into evidence"; and (5) the proponent of the statements must give the adverse party notice of the intent to offer the statement, including the name and address of the declarant.

[16] A district court's decision to admit evidence under the residual hearsay exception will be upheld "unless we have a 'definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.'" *United States v. Donlon,* 909 F.2d 650, 655 (1st Cir.1990) (quoting *Brookover v. Mary Hitchcock Memorial Hospital,* 893 F.2d 411, 419 (1st Cir.1990) (quoting *United States v. Doe,* 860 F.2d 488, 491 (1st Cir.1988), *cert. denied sub nom. Crespo-Herrera v. United States,* 490 U.S. 1049, 109 S.Ct. 1961, 104 L.Ed.2d 430 (1989))).

The ACETO year-end summaries for 1984 and 1985 were offered at trial to prove Abdelsamed's income during those years. Salama drafted these statements on September 18, 1988, and he subscribed and swore to their authenticity the following day before an official of the United States Embassy in Cairo.

■ The income summary statements meet all the requirements set forth in CRE 803(24). First, the income summaries bear circumstantial guarantees of trustworthiness. Salama prepared the income summaries from contemporaneous business records and he had personal knowledge of their truth. He attested to the accuracy of the income summaries under oath during the preservation deposition in which he was subject to cross-examination by NYL's counsel. *See Securities Exchange Comm'n v. First City Fin. Corp.,* 890 F.2d 1215, 1225 (D.C.Cir.1989) (finding that statements made in a deposition and subject to cross-examination were admissible under CRE 803(24)). Further, Salama had no interest in the outcome of this lawsuit and we can find no significant motive that Salama might have had to benefit Abdelsamed by lying. *See People v. Fuller,* 788 P.2d 741, 745–46 (Colo.1990) (finding a sufficient indicia of reliability under FRE 803(24) where declarant has no motive to lie). Moreover, the income summaries were material evidence and were more probative than any other evidence that could have been procured through reasonable efforts.[18] Finally, NYL had sufficient notice of Abdelsamed's intent to offer the income summaries at trial since the documents were provided to NYL during a preservation deposition in which NYL had a full opportunity to cross-examine Salama about the documents.

■ We conclude that the district court did not commit error in admitting into evidence the income summaries under the residual hearsay exception. The income summaries are reliable, necessary, and material statements of which NYL had notice. The admission of the income summaries did not

---

**17.** [An insurance company] does not have the right to insist [that] the claim be proved only through certain types of evidence. . . . The issue is not whether the insurance company has received every item of information it requested from an insured. The question is not even whether the insurance company appears to have in its hands the exact type of information it prefers when deciding on a claim. Rather the real question is whether there was enough evidence of whatever form and however ac-

quired that it would be unreasonable for the insurance company to refuse to pay the claim. *McCormick v. Sentinel Life Ins. Co.,* 153 Cal. App.3d 1030, 1046, 200 Cal.Rptr. 732 (2d Dist. 1984).

**18.** At the deposition, Salama emphasized that his company's books contain sensitive information about defense contracts and he was reluctant to deliver the company's books to unknown lawyers to inspect and then to assist them in litigating a case in which his firm had no interest.

constitute reversible error because the information elicited from the summaries was cumulative of other evidence received.[19] We find that the court of appeals erred in concluding that the admission of the income summaries amounted to reversible error since the income summaries did not prejudice NYL's substantial rights;[20] therefore, any error in admitting these exhibits was harmless.

## C. *Evidentiary Ruling 3*

The court of appeals held that Abdelsamed's cross-examination of NYL's medical expert regarding a civil suit (the *Anderson* case[21]) in which the medical expert was a party, and which challenged both the psychometric testing methods the expert used and the expert's ability to interpret the test, constituted reversible error. The court of appeals reasoned that permitting an expert to be cross-examined on matters as to which he was legally obligated to remain silent amounted to harassment and resulted in unfair prejudice to NYL.

At trial, NYL called its medical expert who had performed a psychometric examination for cognitive impairment on Abdelsamed shortly before trial, and who testified that, in his opinion, Abdelsamed was "malingering" and "faking mental illness." NYL's counsel objected to the cross-examination of their expert concerning the *Anderson* case since the case had been settled and the proceedings were made subject to a confidentiality order. The protective order and the confidentiality agreement were neither disclosed to the district court nor made a part of the record in this case.

The district court ruled that the expert could be cross-examined as to whether he had been sued in the *Anderson* case, whether that suit had been settled, and the nature of the claims against him. The district court did not "want to order the witness to breach some other judge's order," but the court noted that "I can't give the witness any guidance in what the court order that may exist says, because I've never seen it."[22] As a solution to the problem of defining proper cross-examination, the district court stated that the expert could respond to any questions about the *Anderson* case by stating he was not permitted to answer questions which

---

**19.** The exhibits were cumulative of other evidence showing that Abdelsamed correctly stated his income to NYL. This evidence included (1) Abdelsamed's statement under oath at trial that his income was $392,000 in 1985, as reported on the NYL application; (2) gross income of $650,000 less business expenses reported to the Internal Revenue Service; (3) an IRS summary reflecting reported income in 1984 and 1985; and (4) testimony from an IRS employee called by NYL regarding the amount of adjusted gross income on Abdelsamed's 1985 tax return and the amount of tax Abdelsamed reported he owed the government for income in 1985.

**20.** At trial, the court took judicial notice that NYL admitted that it possessed no facts contradicting Abdelsamed's representation that he had gross earned income of at least $392,000 for 1985. NYL produced no evidence with which to dispute Abdelsamed's income, aside from the written statement of Abdelsamed's former accountant in which he stated that Abdelsamed incorrectly stated his 1985 income. In his deposition, read to the jury during the trial, however, Abdelsamed's former accountant admitted that he did not have "any fact in [his] possession which indicates that [Abdelsamed's] income statements were untrue." He additionally con-

ceded that he had advised investigators that Abdelsamed had received almost $3.5 million in defense contracts from the United States Government, and that Abdelsamed "had the possibility of making that kind of money" because "everyone [he] had ever talked to ... all felt that Abdelsamed was a brilliant engineer."

**21.** In the *Anderson* case, NYL's expert's computerized psychometric testing of persons who sought insurance benefits for mental illness was challenged as fraudulent. As part of the settlement agreement, at the expert's request, the *Anderson* court issued a protective order sealing the record in the case. The parties to *Anderson* also entered into a confidentiality agreement.

**22.** Abdelsamed's trial counsel served a subpoena duces tecum to obtain the Boulder District Court file in the *Anderson* case. The subpoena was served on Anderson's attorneys. Attorneys for NYL's expert became aware of the subpoena duces tecum and moved to quash. Abdelsamed's counsel abandoned the subpoena duces tecum and, shortly before NYL's expert was called to testify, an order was signed, quashing the subpoena duces tecum.

would require him to violate the *Anderson* court's protective order.[23]

NYL did not object to either of these rulings. Further, NYL did not state that the undisclosed order or agreement from the *Anderson* case barred testimony from its medical expert on the existence of the case.[24]

Abdelsamed contends that, because NYL did not make a timely objection to the trial court's ruling concerning the scope of the expert's cross-examination or provide a copy of the protective order and confidentiality agreement from the *Anderson* case; NYL waived any objection to the district court's ruling and any error may not be predicated on that ruling.

The court of appeals relied upon *Locke v. Vanderark,* 843 P.2d 27 (Colo.App.1992), in support of its ruling. In *Locke,* the court determined that the trial court erred in permitting the cross-examination of a medical expert concerning the fact that he had been sued for malpractice at least six times. The court in *Locke* reasoned that in certain circumstances an inquiry into previous lawsuits in which the expert was the defendant is irrelevant to the expert witness's credibility or bias. Although the *Locke* court held that it was error to permit cross-examination regarding previous malpractice suits, it concluded that it was harmless error because the expert had been effectively impeached on a number of other topics relating to his credibility. *Id.* at 32.

■ The present case is distinguishable from *Locke.*[25] In *Locke,* the court of appeals indicated that the previous malpractice suits

against a neurosurgeon expert witness did not involve the same medical procedures as those at issue in the trial. In the present case, NYL's expert concluded that Abdelsamed was feigning mental illness after analyzing the psychometric test data. However, the reliability of those procedures and the expert's ability to interpret them were previously questioned in *Anderson.* Therefore, the questions regarding the *Anderson* case were relevant to evaluating the expert's credibility in determining Abdelsamed's mental state.

■ NYL opened the door when it questioned its expert on the accuracy of his testing methods and its expert posited that the tests were accurate and standardized because the tests were scored by a computer. The district court limited the cross-examination of NYL's expert by permitting him to state that he was not permitted to answer questions which would require him to violate the *Anderson* court's protective order. The record does not contain evidence that the district court allowed questions that violated the terms of the protective order. The questions that were asked regarding *Anderson* were relevant to weighing the accuracy of the psychometric tests, and determining the expert's bias or credibility. Consequently the district court was correct in permitting Abdelsamed to cross-examine the expert regarding the *Anderson* case.[26]

## IV.

### A. *Jury Instruction No. 14*

The court of appeals held that the district court erroneously instructed the jury on Col-

---

23. NYL suggested this instruction, and the district court adopted it.

24. At no time during the hearing outside the presence of the jury did NYL's counsel assert that the protective order barred all questions about the *Anderson* case. For example, when the district court ruled that Abdelsamed's counsel could ask about the fact that the *Anderson* case had been settled, NYL's counsel did not object.

25. This case is similar to *Locke* to the extent that NYL's expert's credibility was impeached by factors unrelated to the *Anderson* suit. A review of the record indicates that the expert (1) was on the board of directors of a physician-owned malpractice insurance company, and (2) had a financial motive in claiming the tests were reasonable

because he had an active business interest in marketing the tests. These topics impeached the expert's credibility by exposing his bias. Thus, even if it were error to admit the cross-examination of NYL's expert regarding the *Anderson* case, it was harmless error.

26. We also agree with Abdelsamed's contention that, because NYL failed to object to the district court's ruling at trial, NYL waived that objection. *See* CRE 103(a)(1) ("Error may not be predicated upon a ruling which admits ... evidence ..., and ... a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]"); *People v. Watson,* 668 P.2d 965 (Colo.App.1983).

orado law rather than on New York law concerning the elements of rescission.[27] The court of appeals, accepting NYL's contention, reasoned that the instruction may have created an inference that the fact misrepresented must be related to the risk being insured, thereby creating an extra burden of proof for NYL.·

The district court applied New York Law to NYL's counterclaim of rescission. New York and Colorado law both require that a misrepresentation be material before the insurer may rescind the contract. In order to ·rescind an insurance policy, Colorado requires that the misrepresentation be material, that is, it must "affect[ ] either the acceptance of the risk or the hazard assumed by the insurer." *Hollinger v. Mutual Benefit Life Ins. Co.*, 192 Colo. 377, 381, 560 P.2d 824, 827 (Colo.1977); § 10–8–111(3), 4A C.R.S. (1987).[28] New York defines "materiality" as whether the insurance company was "deprived ... of freedom of choice in determining whether to accept or reject the risk." *Leamy v. Berkshire Life Ins. Co.*, 39 N.Y.2d 271, 383 N.Y.S.2d 564, 347 N.E.2d 889, 890 (1976) (quoting *Vander Veer v. Continental Casualty Co.*, 34 N.Y.2d 50, 356 N.Y.S.2d 13, 312 N.E.2d 156, 157 (1974)).

According to NYL, the district court's instruction departed from the *Leamy* standard of requiring that a material misrepresentation "deprive [the insurer of] freedom of choice in determining whether to accept or reject a risk."

According to Abdelsamed, the difference between the language used in the instruction and New York law is inconsequential since

"freedom of choice" in determining whether. "to accept or reject the risk" requires the same analysis as whether the misrepresentation "materially affected either the acceptance of the risk or the hazard assumed by the insurer." Abdelsamed additionally asserts that both definitions of materiality incorporate the generally accepted test of materiality: the misrepresentations must have caused the insurer to issue a policy that the insurer would not otherwise have issued.

▉▉▉▉▉ An instruction which misleads or confuses the jury amounts to error. *States v. R.D. Werner Co.*, 799 P.2d 427, 430 (Colo. App.1990). Language in a jury instruction cannot be a ground for reversal unless it prejudices a party's substantial rights. *Phillips v. Monarch Recreation Corp.*, 668 P.2d 982 (Colo.App.1983).

In *United States v. Scott*, 701 F.2d 1340 (11th Cir.), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983), the Eleventh Circuit found that the trial court's error was harmless in failing to instruct the jury that the case did not involve an intent to defraud where the instruction to the jury explained the mail fraud offense for which defendant was charged, including the element of specific intent.

▉▉▉▉ The essential difference between the jury instruction and New York law on materiality creates a play on words since the law of New York defines a material misrepresentation as "depriv[ing] the insurer of freedom of choice in determining whether to accept or reject the risk," whereas the instruction actually submitted requires only that such mis-

---

**27.** The jury received the following instruction on the law of rescission:

> An insurance company may rescind an insurance policy on the basis of material misrepresentations in an application for insurance if it establishes by a preponderance of the evidence the following:
>
> 1. the applicant made a false statement of fact or concealed a fact in his application for insurance;
>
> 2. the applicant either knowingly or innocently made the false statement or knowingly or innocently concealed the fact;
>
> 3. the false statement of fact or the concealed fact materially affected either the accep-

tance of the risk or the hazard assumed by the insurer;

> 4. the insurer was ignorant of the false statement of fact or concealment of the fact.

**28.** Section 10–8–111(3), 4A C.R.S. (1987), was repealed in 1992 (Act approved April 29, 1992, ch. 207, sec. 22, 1992 Colo. Sess. Laws 1728), and reenacted effective July 1, 1992, as § 10–16–209(3), 4A C.R.S. (1993 Supp.) (Act approved April 29, 1992, ch. 207, sec. 1, 1992 Colo. Sess. Laws 1671).

representation "materially affect" the acceptance of a risk. Although the laws of rescission of a contract in New York and Colorado are semantically different, it is a difference without any significance. Therefore, the language of Instruction No. 14 fairly informed the jury of the applicable law, and any error by the trial court is harmless.[29]

### B. *Special Verdict Form # 2*

The court of appeals additionally held that the language of the rescission instruction constituted reversible error because it permitted the jury to find bad faith breach of contract even if the jury also found that NYL had proven rescission. The court of appeals determined that because Special Verdict Form # 2 allowed the jury to award damages for bad faith breach of contract, even where the jury found that the contract had been rescinded, the verdict form contained reversible error.

According to NYL, Special Verdict Form # 2 had the practical effect of eliminating NYL's counterclaim of rescission from the deliberations. NYL further argues that, because this jury had before it an incorrect statement of the law, its influence cannot be lightly ignored.

▉▉▉ Appellate courts are bound by the jury's findings, and jury verdicts will not be reversed for inconsistency where the jury has been properly instructed by the trial court and the record contains sufficient competent evidence to support the finding. *Alzado v. Blinder, Robinson & Co.,* 752 P.2d 544, 554 (Colo.1988); *Vigil v. Pine,* 176 Colo. 384, 387, 490 P.2d 934, 936 (Colo.1971); *Fletcher v. Porter,* 754 P.2d 788, 790 (Colo. App.1988). An appellate court has the onus of reviewing the jury instructions, the jury verdict forms, and the evidence, and determining from the record whether there is competent evidence from which the jury logi-

cally could have reached its verdicts. *H & H Distributors, Inc. v. BBC Int'l, Inc.,* 812 P.2d 659, 663 (Colo.App.1990). Further, an appellate court has a duty to attempt to reconcile the jury's answers to a special verdict, if it is at all possible, based upon the evidence and the instructions given. *Fletcher,* 754 P.2d at 790. If there is a view of the case that makes the jury's answers consistent, an appellate court has a duty to reconcile the special verdict in that way. *Lonardo v. Litvak Meat Co.,* 676 P.2d 1229, 1231 (Colo.App. 1983). With these principles in mind, we determine that special verdict form # 2 is consistent.

▉▉▉ In *Consolidated Hardwoods, Inc. v. Alexander Concrete Construction Inc.,* 811 P.2d 440 (Colo.App.1991), the jury's finding of negligence and its award of actual damages to the owner were not inconsistent with the jury's finding that the contractor breached the contract and an award of nominal damages. From the evidence adduced, the jury could have found that the contractor was not obligated to do certain work but was negligent when it did so and that the contractor also breached the contract in its specific terms but that the damage from such breach was nominal.

We find Abdelsamed's argument persuasive. According to Abdelsamed, the alleged error in the special verdict form is unlikely to have prejudiced NYL's substantial rights because the jury entered no findings concerning rescission on special verdict form # 2. In fact, the jury entered a verdict in favor of Abdelsamed on his breach of contract claim and found against NYL on its rescission counterclaim. Therefore, the jury could not have committed the error that the verdict forms allegedly invited—simultaneous award of damages for bad faith breach of contract and findings of rescission—and the error in special verdict form # 2 was harmless.[30]

### V.

For the foregoing reasons, we conclude that the district court did not abuse its dis-

---

29. Further, based on the record, NYL does not establish that it preserved these issues for review since it raised no objections concerning instruction No. 14 at trial and failed to proffer an instruction of its own on this subject.

30. We further note that the jury returned its verdict on special verdict form # 1 and left blank special verdict form # 2.

▮▮▮▮▮▮▮▮▮▮▮▮

cretion (1) in its finding that the "other acts" evidence was inadmissible, (2) in its evidentiary rulings, or (3) in its jury instruction and special verdict form # 2. The trial court's rulings, even if erroneous, were not sufficient grounds for reversal.[31] We therefore reverse the court of appeals and remand with directions to reinstate the trial court's judgment.

ROVIRA, C.J., does not participate.

---

**31.** Finally, NYL argues that, if this court finds that the alleged evidentiary errors, standing alone, do not sufficiently prejudice NYL's position so as to require a reversal, the cumulative effect of the trial court's errors substantially prejudiced the plaintiff's case so as to require a reversal. We disagree. We believe the district court's evidentiary rulings were sufficiently supported by the evidence and did not affect the outcome of the trial.